[No. G043190. Fourth Dist., Div. Three. Apr. 28, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ELIJAH LEIGH FERGUSON, Defendant and Appellant.

1072

## COUNSEL

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Randall D. Einhorn and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

O'LEARY, J.—Elijah Leigh Ferguson appeals from his conviction for second degree murder, driving under the influence causing great bodily injury, and driving with a blood-alcohol level of 0.08 percent or higher causing great bodily injury. Ferguson contends (1) the trial court erred in denying his request for an instruction on the partial defense of unconsciousness as a result of voluntary intoxication (CALCRIM No. 626), which could have reduced the offense to involuntary manslaughter; (2) evidence of data obtained from his car's event data recorder was improperly admitted; and (3) the trial court failed to properly consider his request for alternative sentencing as a combat veteran suffering from service-related posttraumatic stress disorder under Penal Code section 1170.9.[1] We find no error and affirm the judgment.

### FACTS

*The Accident*

On February 22, 2008, Michael and Grace Sein were driving home around 11:00 p.m. They were stopped at a red light at the intersection of MacArthur and Jamboree in Newport Beach, when they were rear-ended by a car driven by Ferguson, a marine stationed at Camp Pendleton. Michael Sein was killed; Grace Sein was severely injured. Ferguson suffered a broken ankle and some internal injuries. A witness to the accident testified that immediately after the collision, Ferguson looked "normal" but seemed disoriented and confused "like a person [who] was just in an accident."

The prosecution's accident reconstruction expert opined Ferguson was driving about 75 miles per hour at the time of impact based on the injuries and the condition and placement of the vehicles. The event data recorder

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

recovered from Ferguson's vehicle showed his car, a Dodge Caliber, was traveling 75 miles per hour and accelerating when he struck the Seins' car, an Aston Martin, although acceleration had stopped one-tenth of a second before impact.

Newport Beach Police Officer Troy Zeeman responded to the crash site, and someone at the scene indicated a possibly intoxicated driver was involved. Zeeman interviewed Ferguson at the hospital about two hours after the accident. Ferguson displayed objective signs of intoxication including reddish, watery eyes, slurred speech, and a moderate to strong odor of alcohol. However, Ferguson did not seem confused and was able to respond to questions. Ferguson did not remember the accident. Ferguson claimed he drank only two beers that night. Ferguson told Zeeman he was driving to his home in Santa Ana from Camp Pendleton and at Zeeman's request gave a detailed description of the route he would normally drive to get there. Ferguson appeared confused when Zeeman told him he had been driving in the wrong direction from his home.

A blood sample was taken from Ferguson about three hours after the accident. His blood-alcohol level measured 0.12 percent. By extrapolation, Ferguson would have had between a 0.16 and 0.17 percent blood-alcohol concentration at the time of the accident, or if he was a "tolerant drinker," it could have been as high as 0.21 percent.

*Marine Corps Liberty Briefings*

In 2008, Ferguson was a Marine Corps lance corporal stationed at Camp Pendleton. Several marines testified about Marine Corps education and prevention programs concerning drinking and driving. In February 2008, Marine Corps Staff Sergeant Michael Booker and First Sergeant Eric Cook were responsible for giving weekly "liberty briefings" (safety briefings) to their units and platoons before individuals could leave base. Ferguson was in Booker's platoon and a member of Cook's company. Ferguson was present at the liberty briefing jointly given by Booker and Cook at 1:00 p.m. on February 22, 2008.

Booker testified he had given over 100 liberty briefings and every liberty briefing he gave began with a discussion of the dangers of drinking and driving. Booker testified it is an important Marine Corps rule that a marine may not drive after consumption of any alcohol. He elaborated on that rule during the liberty briefings—he told the marines if they were going to drink, they could not drive. He told them typically in a drunk driving accident, the drunk driver usually is not hurt; rather the sober person is the one who usually suffers "great bodily harm or . . . ends up killed in the accident."

Cook testified he too discussed the risks and consequences of drinking and driving during the weekly liberty briefings. Cook recalled he would look at the entire company while he talked, to ensure they were listening to him. Cook warned his marines about DUI's (driving under the influence), which were a huge concern because a marine who suffered one would be "taken out of the fight." Cook told his marines each was expected to have a "liberty buddy" to call upon while on leave. Marines were given "Arrive Alive" cards they could use for cab rides back to base if they had been drinking—the officer on duty would pay the cab fare, although the marine would have to later repay half.

Booker and Cook testified there are signs and banners posted throughout the base warning marines against drinking and driving. Cars destroyed in accidents are placed at certain places throughout the base with similar warning signs. There is a sign at the exit gate listing the number of individuals from the base who got DUI's that year.

Several of Ferguson's fellow marines also testified about the liberty briefings. They testified they all attended liberty briefings at least once a week and the dangers of drinking and driving were always discussed at those briefings. They testified about Ferguson's presence at the February 22, 2008, liberty briefing. One marine remembered Booker saying at that briefing, " 'If you drink and drive, it could be my family out there that you kill. Don't do it. It's wrong.' "

*Ferguson's Drinking and Driving on February 22, 2008*

Ferguson was deployed to Iraq in 2007 and stationed at Camp Pendleton upon his return. Because Ferguson was married, he did not have a room in the barracks or live on base. Ferguson and his wife owned only one car. She usually drove him to and from work at the base, but sometimes Ferguson drove himself to work. Sometimes he stayed on base all night.

Ferguson had his car on the base on February 22. Corporal Craig Leedham testified he and Ferguson started drinking beer with Lance Corporals Michael Zingelewicz and John Chambers about 4:00 p.m. on the day of the accident, but Ferguson might have begun drinking before then. Ferguson wanted to drive himself home, but Leedham stopped him because he was drunk.

Around 5:00 p.m., Ferguson walked into Lance Corporal Joshua Suprise's room. Ferguson's speech was slurred, and he was intoxicated. Suprise explained he was one of "the new guys" on base and not in the "same peer group" as Ferguson because Ferguson had already been deployed, and Ferguson outranked Suprise. When Suprise asked Ferguson if he was all

right, Ferguson replied, " 'If you ask me that again, I'm going to punch you in the face,' " and he walked out.

Ferguson came back into Suprise's room again between 7:00 p.m. and 8:00 p.m. and was still drunk. Ferguson "passed out" on the bed and Suprise let him sleep until the movie Suprise and another marine were watching ended. Concerned that Ferguson was drunk and might try to drive himself home, Suprise alerted Corporal Luke Hughes, Ferguson's good friend, and asked him to take Ferguson's car keys. Suprise also told Sergeant Brian Henexson that he was concerned Ferguson would try to drive home when he awoke.

Hughes and Henexson found Ferguson sleeping with his cell phone in his hands. Hughes took Ferguson's car keys from his pocket, woke him up, and took him outside. Ferguson's speech was slurred, and he could not walk straight. Ferguson repeatedly said he wanted to go home, insisted he was fine to drive, and asked for his car keys, but Hughes told him "it wasn't going to happen."

Although Ferguson was trying to sober up by drinking water, Hughes had no doubt Ferguson was unsafe to drive. He locked Ferguson's car keys in a cabinet. Ferguson got a telephone call from his wife, and while they were talking, Hughes went and found Ferguson an empty room in the barracks where he could sleep. When the call ended, Hughes told Ferguson he should sleep on base; Ferguson did not acknowledge Hughes and showed "no emotion" in response. Ferguson then got a second telephone call from his wife, and it was apparent they were fighting. Ferguson was getting upset and it was apparent he wanted to go home because of the fight with his wife. One marine testified Ferguson said his wife would not let Ferguson come home and said she was going to divorce him.

Hughes then suggested to Ferguson that Hughes and two other marines could borrow another vehicle, take Ferguson (and his car) home, and return to base in the other car. Ferguson expressed no opinion about that plan. But when Hughes talked to Ferguson's wife, she said she did not want Ferguson to come home because he had been drinking. Accordingly, Hughes again told Ferguson he should stay on base. Ferguson seemingly agreed and fell asleep. Hughes left the base, leaving Ferguson's car keys with Henexson, who was the most senior ranked marine present. In the meantime, Suprise returned to his own room to watch another movie.

Throughout the evening, Ferguson repeatedly came to Henexson asking for his car keys so he could drive home; Henexson refused. Ferguson then asked Henexson for his car keys just so he could get something out of his car; Henexson escorted him to the car and unlocked it, keeping the keys. Ferguson

shuffled some papers around, but took nothing from the car. Ferguson did not appear to be as drunk as he had been earlier and insisted he had sobered up by sleeping and drinking water. Nonetheless, Henexson still felt Ferguson was too intoxicated to drive and would not give him the keys. They returned to the barracks. Henexson believed Ferguson was going back to Suprise's room to sleep because he told Henexson as he departed he wanted his car keys back first thing in the morning.

Between 10:00 p.m. and 10:30 p.m., Ferguson returned to Suprise's room. Ferguson still appeared intoxicated. Ferguson told Suprise he wanted Suprise to get his car keys from Henexson and drive him home. Ferguson told Suprise he could spend the night at Ferguson's house, and Ferguson would drive him back to base in the morning. Suprise replied he preferred to stay on base and suggested Ferguson should stay on base and sleep it off. Ferguson became angry and told Suprise he had to listen to him because Ferguson outranked him. Accordingly, Suprise retrieved Ferguson's car keys from Henexson, after assuring Henexson that he, not Ferguson, was going to drive.

Suprise returned to his room to get Ferguson. Ferguson said he did not want anyone to drive with him and demanded his keys. He told Suprise he had sobered up by drinking water, eating, and sleeping and felt fine to drive. Ferguson got angry, started yelling at Suprise, and raised his fists. Ferguson again told Suprise he must do as Ferguson said because Ferguson outranked him. Suprise felt intimidated and threatened, and he gave Ferguson his keys, even though he believed Ferguson was not safe to drive.

*Defense*

Ferguson produced testimony concerning his experiences while deployed in Iraq, his increased drinking and marital problems upon his return, and posttraumatic stress disorder (PTSD). Ferguson's friend, Hughes, was deployed to Iraq with Ferguson. He testified Ferguson was an "excessive drinker" before his deployment, but following his return he drank more. There had been other occasions where Ferguson's friends had had to drive him home or lock him in a room to sober up. Hughes and other marines noticed an obvious change in Ferguson after returning from Iraq. He kept more to himself at work, was drinking more, and often preferred to stay with friends on base rather than go home to his wife. Hughes had two or three conversations with Ferguson about drinking and driving, and warned him he was "starting to get out of control . . . ."

Jared Jackson, another marine who served with Ferguson in Iraq, testified as to the very stressful situations in which they operated, including patrols where they were under constant threat of roadside bombs and possible

ambushes. Before their deployment, Ferguson drank in social settings. After they returned, Ferguson began to drink excessively, and seemed disconnected as if something was not right.

Ferguson's wife, Carla Ferguson (Carla), had given birth to the couple's son while Ferguson was deployed in Iraq. She testified that when they first met, Ferguson was only a social drinker. Beginning about a month after he returned from his deployment, Ferguson began to drink heavily, which upset Carla because it took him away from the family. Carla noticed Ferguson suffered from insomnia, nightmares, night sweats, talking in his sleep and paranoia when they went to public places. Carla wanted Ferguson to take some kind of action and threatened him with divorce and taking his child away if he did not. Ferguson came home one day angry because he was going to be tested for PTSD.

On the night of the accident, Carla was recovering from recent surgery. She had several telephone conversations with Ferguson, and she was angry because he was out drinking, instead of being at home helping her with the baby. Carla told Ferguson she was going to pack his stuff up, he would be out, and she might not let him see their son.

Hughes and Jackson both testified about negative treatment of marines diagnosed with PTSD. There was a stigma attached to the diagnosis because it precluded a marine from handling weapons, which essentially precluded remaining on active duty. Marines returning from deployment are required to fill out a postdeployment questionnaire, and they discuss among themselves how to answer the questions to avoid being tested for PTSD. There had been suicides on base by marines after returning from deployment in Iraq.

Psychologist Nancy Kaser-Boyd interviewed Ferguson twice after the accident. She described PTSD as an anxiety disorder resulting from a significant threat to safety or life, and the feeling of helplessness or horror. The Department of Veterans Affairs found one in six soldiers has PTSD; an independent study by the Rand Corporation indicated it was one in five, and possibly one in three.

Kaser-Boyd opined Ferguson had PTSD and a substance abuse disorder. It was very common for people suffering PTSD to self-medicate. Ferguson told Kaser-Boyd he would start sneaking liquor at noon, which she presumed meant while he was at work. The jail physician prescribed antidepressants and antipsychotics for Ferguson. Ferguson's most prominent symptoms were avoidance (in which the person works very hard to repress memories of the trauma, detaching himself or herself not only from the memories but from other people), and hyperarousal (in which the person has trouble sleeping,

feels constantly on edge, and is often irritable and angry). Ferguson told Kaser-Boyd he had difficulty sleeping because of weird dreams, but alcohol helped him. He reported he often had to drink almost to the point of passing out just to get to sleep.

*Charges, Verdicts and Sentence*

Ferguson was charged by indictment with second degree murder of Michael Sein (§ 187, subd. (a)) (count 1); driving under the influence causing bodily injury to Grace Sein (Veh. Code, § 23153, subd. (a)) (count 2); and driving with a blood-alcohol level of 0.08 percent or more and causing bodily injury to Grace Sein (Veh. Code, § 23153, subd. (b)) (count 3). The indictment contained great bodily injury enhancement allegations under section 12022.7, subdivision (a), as to counts 2 and 3. A jury found Ferguson guilty as charged and found the special allegations true.

At the sentencing hearing, Ferguson's request for sentencing under section 1170.9 (alternative sentencing program for combat veterans with PTSD, substance abuse problems, or psychological programs stemming from service) was denied. The trial court sentenced Ferguson to a total term of 15 years to life comprised of the mandatory term of 15 years to life on count 1, with a two-year middle term and consecutive three-year great bodily harm enhancement on count 2 to run concurrently with the base term. The trial court stayed the sentence on count 3 pursuant to section 654.

## DISCUSSION

1. *Failure to Instruct on Defense of Unconsciousness Due to Voluntary Intoxication*

Ferguson contends the trial court erred in denying his request for a jury instruction on the defense of unconsciousness as a result of voluntary intoxication (CALCRIM No. 626). He argues that by rejecting the instruction, the court failed to instruct the jury it could find him guilty of the lesser included offense of involuntary manslaughter based on unconsciousness due to voluntary intoxication. We reject his contention.

██ It is well established that driving while intoxicated is an act which may support a conviction for second degree murder under an implied malice theory. (See, e.g., *People v. Martin* (2000) 78 Cal.App.4th 1107, 1110 [93 Cal.Rptr.2d 433] (*Martin*); *People v. Autry* (1995) 37 Cal.App.4th 351, 358 [43 Cal.Rptr.2d 135]; *People v. Watson* (1981) 30 Cal.3d 290, 300–301 [179 Cal.Rptr. 43, 637 P.2d 279] (*Watson*).) As to count 1, the second degree murder of Michael Sein, the prosecution proceeded on an implied malice

theory, which required proof Ferguson (1) knew his conduct endangered the life of another and (2) acted with a conscious disregard for life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 [91 Cal.Rptr.3d 106, 203 P.3d 425].) " 'One who wilfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' " (*Watson, supra,* 30 Cal.3d at pp. 300–301.)

Ferguson concedes his voluntary intoxication cannot be used to negate implied malice in a second degree murder prosecution. (§ 22, subd. (a); *People v. Turk* (2008) 164 Cal.App.4th 1361, 1375 [80 Cal.Rptr.3d 473]; *People v. Timms* (2007) 151 Cal.App.4th 1292, 1298 [60 Cal.Rptr.3d 677]; *Martin, supra,* 78 Cal.App.4th at pp. 1114–1115; *People v. Reyes* (1997) 52 Cal.App.4th 975, 984, fn. 6 [61 Cal.Rptr.2d 39].) He nonetheless argues unconsciousness due to voluntary intoxication may be raised as a partial defense reducing the offense to involuntary manslaughter. Accordingly, he requested the trial court to instruct the jury with CALCRIM No. 626.[2]

■ CALCRIM No. 626 is derived from section 22, which precludes use of voluntary intoxication to negate mental state altogether but permits its use on the issue of whether or not a defendant actually formed a required specific intent, and section 26, which provides all persons are capable of committing crimes except, as relevant here, persons "who committed the act charged without being conscious thereof." The instruction does not provide a complete defense but rather a partial defense, in which a person who kills while

---

[2] CALCRIM No. 626 states: "Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions.

"A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

"Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:

"1. The defendant killed without legal justification or excuse;

"2. The defendant did not act with the intent to kill;

"3. The defendant did not act with a conscious disregard for human life;

"AND

"4. As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of (murder/[or] voluntary manslaughter)."

unconscious due to voluntary intoxication, is guilty of involuntary man-slaughter, rather than murder. (*People v. Ochoa* (1998) 19 Cal.4th 353, 423–424 [79 Cal.Rptr.2d 408, 966 P.2d 442] (*Ochoa*).)

■ The trial court refused Ferguson's request for CALCRIM No. 626 because although involuntary manslaughter is usually a lesser included offense of murder (*People v. Sanchez* (2001) 24 Cal.4th 983, 989 [103 Cal.Rptr.2d 698, 16 P.3d 118] (*Sanchez*), overruled on another ground in *People v. Reed* (2006) 38 Cal.4th 1224, 1228–1229 [45 Cal.Rptr.3d 353, 137 P.3d 184]), in the context of drunk driving it is not. The manslaughter statute, section 192, defines involuntary manslaughter as an unlawful killing without malice "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. *This subdivision shall not apply to acts committed in the driving of a vehicle.*" (§ 192, subd. (b), italics added.)[3]

Ferguson argues that although under the manslaughter statute he could not be found guilty of involuntary manslaughter, there are *three* means of obtaining an involuntary manslaughter conviction. Section 192, subdivision (b), covers the first two: commission of an unlawful act, not amounting to felony and commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. But the Supreme Court has also "defined a nonstatutory form of the offense, based on the predicate act of a noninherently dangerous felony committed without due caution and circumspection. [Citation.]" (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007 [114 Cal.Rptr.3d 696].)

■ In the voluntary intoxication context, a predicate act supporting nonstatutory involuntary manslaughter could be a defendant's "negligence in self-intoxicating" to the point of unconsciousness. (*Ochoa, supra*, 19 Cal.4th at p. 423.) Ferguson argues the classic case for second degree implied malice murder in the drunk driving context is when a defendant is aware of the dangers of drinking and driving, but nonetheless drinks knowing he or she will also be driving. (*Watson, supra*, 30 Cal.3d at pp. 300–301.) But Ferguson argues a defendant might begin drinking not intending to drive, but then drinks to the point of unconsciousness and in that unconscious state, not knowing what he or she is doing, drives. In such a case, Ferguson asserts, the

---

[3] Section 192, subdivision (c), defines vehicular manslaughter as an unlawful killing without malice occurring when driving a vehicle, and section 191.5 defines gross vehicular manslaughter while intoxicated. Gross vehicular manslaughter while intoxicated is a lesser related, not a lesser included, offense of murder. (*Sanchez, supra*, 24 Cal.4th at p. 992.) As such, Ferguson had no right to an instruction on vehicular manslaughter. (*People v. Valentine* (2006) 143 Cal.App.4th 1383, 1387 [49 Cal.Rptr.3d 948].)

voluntary intoxication would reduce the crime to involuntary manslaughter notwithstanding section 192, subdivision (b)'s exclusion of "acts committed in the driving of a vehicle," from the definition of involuntary manslaughter.

■ Even were we to agree there are circumstances in second degree implied malice murder drunk driving cases in which a defense of unconsciousness from voluntary intoxication can be raised, this would not be such a case. A trial court is required to instruct "on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094] (*Breverman*).)

■ Here, there was insufficient evidence to support an instruction on unconsciousness as a partial defense. An unconscious act, as defined "within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional." (*People v. Sedeno* (1974) 10 Cal.3d 703, 717 [112 Cal.Rptr. 1, 518 P.2d 913], overruled in part on other grounds in *Breverman, supra*, 19 Cal.4th at p. 165, and disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) Unconsciousness "need not mean that the actor lies still and unresponsive: section 26 describes as '[in]capable of committing crimes . . . [¶] . . . [¶] . . . [p]ersons who *committed the act . . .* without being conscious thereof.' (Italics added.) Thus, unconsciousness ' "can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting." ' [Citations.]" (*Ochoa, supra*, 19 Cal.4th at pp. 423–424.)

*People v. Halvorsen* (2007) 42 Cal.4th 379, 418–419 [64 Cal.Rptr.3d 721, 165 P.3d 512], is instructive. There the defendant sought an instruction on unconsciousness relying upon evidence he had spent the afternoon drinking at a bar, producing a blood-alcohol level estimated at 0.20 percent at the time of the shootings, he suffered from bipolar disorder with symptoms that were exacerbated by intoxication, immediately before the shootings he had "strange sensations . . . suggestive of an altered state of consciousness," and he lacked recollection of the shootings. (*Id.* at p. 417.) The Supreme Court held the unconsciousness instruction was not warranted because there was no evidence the defendant "lack[ed] awareness of his actions during the course of the offenses." (*Id.* at p. 418.) The "complicated and purposive nature of [defendant's] conduct" during the commission of the crimes and his memory loss did not support an inference of unconsciousness. (*Id.* at p. 418.)

Similarly, in *Ochoa, supra*, 19 Cal.4th at pages 423–424, the Supreme Court held there was insufficient evidence to warrant an unconsciousness

instruction. There the defendant approached his victim and "had the presence of mind to tell her to be quiet, to display a knife, and to take her to [a] secluded [place]. He asked her to remove her pants. Later she asked if she could put her pants back on, and he gave permission. All of these facts show a methodical, calculated approach to the crimes. There was no evidence that he then consumed more cocaine before stabbing her. Rather, he reflected on the possible consequences of letting her live, decided that the risk was too great, and killed her." The court found the defendant's statement "he did not know what was going through his mind" only suggested the defendant's "intoxication clouded his judgment and caused him to make foolish choices," not that he was unconscious due to voluntary intoxication when he committed the offenses. (*Id.* at p. 424.)

Here, Ferguson asserts the unconsciousness instruction was warranted by evidence of his excessive drinking on the day of the car accident and in the months leading up to the accident. He had been drinking throughout the day with fellow marines, and was becoming increasingly belligerent. Ferguson fell asleep a few times during the day and when he awoke he repeatedly told his friends he wanted to drive himself home. Ferguson showed little emotion in response to his friend's first proposal that other marines would drive him home and follow in a second car in which they could return to base. Ferguson told Kaser-Boyd he often began drinking early in the day and would sometimes drink until he passed out. Ferguson's blood-alcohol content was between 0.16 percent and 0.21 percent at the time of the accident.

While the evidence upon which Ferguson relies certainly supports the conclusion he was intoxicated and his intoxication caused him to make extremely poor choices, it cannot support a conclusion he was unconscious at the time of the accident or that he lacked awareness of his actions leading up to the accident.

Preliminarily, we note that although Ferguson's wife normally took him to and picked him up from work, on this occasion Ferguson drove himself to work. Accordingly, Ferguson began consuming alcohol that day knowing he was going to have to, at some point, drive himself home. Ferguson was drinking throughout the afternoon, but by all accounts several hours had passed from when Ferguson quit drinking until he drove off base that night. During that time he was trying to sober himself up by drinking water and sleeping. Ferguson repeatedly asked for his car keys, which his friends had taken away from him, and insisted to them he was safe to drive.

Ferguson then had the presence of mind to concoct at least two schemes for getting his keys. First, he asked Henexson for the keys so he could get something out of the car. But Henexson was not so easily duped, and he

insisted on escorting Ferguson to the car and keeping Ferguson's keys. There, Ferguson simply shuffled some things around but retrieved nothing. Ferguson then indicated to Henexson he was returning to Suprise's room to sleep, telling Henexson he wanted his keys back first thing in the morning.

Ferguson then turned on Suprise, asking him to get the car keys from Henexson and drive him home, saying he would drive Suprise back to base in the morning. When Suprise balked, Ferguson pulled rank on Suprise. After Suprise retrieved the car keys from Henexson, promising he, not Ferguson, was going to drive, Ferguson again pulled rank on Suprise and demanded the keys.

A witness who saw Ferguson right after the accident said he looked "normal," although he was disoriented and confused "like a person [who] was just in an accident." The car's event data recorder indicated Ferguson had been rapidly accelerating but then lifted his foot off the accelerator an instant before hitting the Seins' car, suggesting he saw the car before he hit it and was attempting to avert the collision. When Zeeman interviewed Ferguson about two hours after the accident, Ferguson appeared intoxicated but did not seem confused and was able to respond to Zeeman's questions. Although Ferguson did not remember the accident, he was able to explain to Zeeman what he was doing (driving to his home in Santa Ana from Camp Pendleton) and could give Zeeman a detailed description of the route he would normally drive (although he had taken a wrong turn somewhere along the way).

In short, the trial court did not err by refusing to instruct on unconsciousness due to voluntary intoxication. The uncontroverted facts were that Ferguson was aware he was intoxicated, was attempting to sober up, and was focused on getting himself home. He was capable of devising plans to dupe his fellow marine into retrieving his car keys. He drove a substantial distance prior to the accident without apparent incident. There was insufficient evidence "deserving of consideration that [he] was unconscious due to voluntary intoxication" (*People v. Halvorsen, supra*, 42 Cal.4th at p. 418), when the accident occurred.

## 2. *Admissibility of Event Data Recorder*

Ferguson contends the trial court erred by denying his motion to exclude any evidence concerning information obtained from the event data recorder retrieved from his car pursuant to a search warrant. The prosecution's expert testified the event data recorder recovered from Ferguson's vehicle indicated his car was accelerating before he hit the Seins' car. Ferguson's car was traveling at 75 miles per hour, but acceleration had stopped one-tenth of a second before impact. Ferguson argues the evidence was inadmissible under Vehicle Code section 9951. We disagree.

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Ferguson argues Vehicle Code section 9951, subdivision (d), precludes admission of information obtained from an event data recorder in a judicial proceeding because it specifically limits use of the data to the "motor vehicle safety and medical research communities to advance motor vehicle safety . . . ."

 Vehicle Code section 9951 requires the manufacturers of vehicles equipped with recording devices commonly called " 'event data recorders (EDR)' or 'sensing and diagnostic modules (SDM),' " to disclose their existence in the owner's manual. (Veh. Code, § 9951, subd. (a).) Vehicle Code section 9951, subdivision (c), provides, "Data described in subdivision (b)[4] that is recorded on a recording device may not be downloaded or otherwise retrieved by a person other than the registered owner of the motor vehicle, except under one of the following circumstances: [¶] (1) The registered owner of the motor vehicle consents to the retrieval of the information. [¶] (2) *In response to an order of a court having jurisdiction to issue the order.* [¶] (3) For the purpose of improving motor vehicle safety, including for medical research of the human body's reaction to motor vehicle accidents, and the identity of the registered owner or driver is not disclosed in connection with that retrieved data. . . . [¶] (4) The data is retrieved by a licensed new motor vehicle dealer, or by an automotive technician . . . for the purpose of diagnosing, servicing, or repairing the motor vehicle." (Italics added.) Vehicle Code section 9951, subdivision (d), upon which Ferguson relies provides, "A person authorized to download or otherwise retrieve data from a recording device *pursuant to paragraph (3) of subdivision (c)*, may not release that data, except to share the data among the motor vehicle safety and medical research communities to advance motor vehicle safety, and only if the identity of the registered owner or driver is not disclosed." (Italics added.)

Ferguson argues Vehicle Code section 9951, subdivision (d), prohibits use of data from an event data recorder for any purpose other than improving vehicle safety. He argues the legislative history of Vehicle Code section 9951 confirms it was enacted for consumer protection, which precludes its use for other purposes. We do not disagree with Ferguson's initial observation— Vehicle Code section 9951 was adopted in 2003 by Assembly Bill No. 213

---

[4] Vehicle Code section 9951, subdivision (b), defines such a recording device as "installed by the manufacturer of the vehicle and [that] does one or more of the following, for the purpose of retrieving data after an accident: [¶] (1) Records how fast and in which direction the motor vehicle is traveling. [¶] (2) Records a history of where the motor vehicle travels. [¶] (3) Records steering performance. [¶] (4) Records brake performance, including, but not limited to, whether brakes were applied before an accident. [¶] (5) Records the driver's seatbelt status. [¶] (6) Has the ability to transmit information concerning an accident in which the motor vehicle has been involved to a central communications system when an accident occurs."

(2003–2004 Reg. Sess.), and Assembly committee reports demonstrate the purpose of the law was to confirm that data recorded by an event data recorder is the property of the car owner and its use should be restricted so as to protect consumer privacy.[5] But the issue is not whether Vehicle Code section 9951 *permits* admission of EDR (event data recorder) data into evidence—as already noted, all relevant evidence is admissible unless otherwise provided by statute (Evid. Code, § 351)—the issue is whether the statute *prohibits* admission of EDR evidence. And in arguing Vehicle Code section 9951, subdivision (d), precludes use of EDR data in judicial proceedings, Ferguson has taken its language out of context.

█ "Well-settled principles of statutory construction tell us that when language is clear and unambiguous, ' " 'there is no need for construction and courts should not indulge in it.' " . . .' [Citation.]" (*Butler v. Bell Helicopter Textron, Inc.* (2003) 109 Cal.App.4th 1073, 1085 [135 Cal.Rptr.2d 762].) On its face, Vehicle Code section 9951, subdivision (d)'s restriction on release and use of data obtained from an EDR applies only when the data was retrieved pursuant to paragraph (3) of subdivision (c), i.e., when the data was retrieved or downloaded by someone "[f]or the purpose of improving motor vehicle safety, including for medical research of the human body's reaction to motor vehicle accidents, and the identity of the registered owner or driver is not disclosed in connection with that retrieved data." Nothing in the statute purports to restrict the use or admissibility of the data when it has

---

[5] One Assembly report noted the bill's author was concerned that "[a]s more vehicles are equipped with sophisticated EDRs or SDMs that can record a wide spectrum of data related to those vehicles' operation and response in the case of accidents, the author believes that motor vehicle manufacturers and subscription services should disclose to the buyer or lessee the fact that such equipment has been installed on his or her new vehicle and that it may record or transmit operation data. [¶] While these devices can provide investigators, insurance companies, and manufacturers with valuable data on how a particular vehicle responds to specific circumstances, the author is concerned that EDRs and SDMs pose a potential invasion of privacy in that a vehicle's operator can essentially be monitored, not only in the case of an accident, but potentially in all situations involving when, where and how the vehicle is operated." The report went on to observe, "EDRs and SDMs are designed to provide manufacturers, insurance companies, law enforcement agencies, and other parties interested in the causes and effects of a motor vehicle accident with important data. The recording device can show whether or not a vehicle's brakes were applied at any time before the accident, whether the driver attempted any other evasive maneuvers, and how fast the vehicle was traveling directly before and after initial contact. [¶] While this information is valuable to those with interests in the well-being of the vehicle and its inhabitants, the information the device provides can be considered an intrusion into a vehicle owner's privacy and desire to be driving without being tracked. This bill does not preclude manufacturers from installing such equipment but does require them to disclose that fact in the owner's manual and requires subscription services to provide a similar disclosure to their subscribers." (Assem. Com. on Appropriations, Analysis of Assem. Bill No. 213 (2003–2004 Reg. Sess.) as amended Mar. 12, 2003, pp. 1–3.)

been lawfully obtained under paragraph (2) of subdivision (c), i.e., "[i]n response to an order of a court having jurisdiction to issue the order."

Ferguson's reliance on the recent decision in *People v. Xinos* (2011) 192 Cal.App.4th 637 [121 Cal.Rptr.3d 496] (*Xinos*), is misplaced. *Xinos* was a Fourth Amendment case. It held "a motorist's subjective and reasonable expectation of privacy with regard to her or his own vehicle encompasses the digital data held in the vehicle's [sensing and diagnostic module (SDM)]." (*Xinos, supra,* at p. 659.) The court concluded the warrantless downloading of the SDM's digital data, a year after the accident and unsupported by probable cause, violated the defendant's Fourth Amendment rights. (192 Cal.App.4th at pp. 659–660.) Accordingly, it held the trial court erred by denying the defendant's motion to suppress. (*Id.* at p. 664.) Here, there is no Fourth Amendment issue. Ferguson concedes the data from his vehicle's EDR was lawfully obtained pursuant to a search warrant.

### 3. Denial of Alternate Sentencing Under Section 1170.9

Ferguson contends his sentence must be reversed and the matter remanded for resentencing because the trial court failed to adequately consider his request for sentencing under section 1170.9. That provision gives the trial court a discretionary alternative to imposing either probation or imprisonment in the case of combat veterans who allege they committed their offenses as a result of combat-service-related PTSD, substance abuse, or psychological problems. We find no reversible error.

### A. Section 1170.9

We begin with the statute. The version of section 1170.9, former subdivision (a), in effect at the time of Ferguson's sentencing[6] provided, "In the case of any person convicted of a criminal offense who would otherwise be sentenced to county jail or state prison and who alleges that he or she committed the offense as a result of post-traumatic stress disorder, substance abuse, or psychological problems stemming from service in a combat theater in the United States military, the court shall, prior to sentencing, hold a hearing to determine whether the defendant was a member of the military forces of the United States who served in combat and shall assess whether the defendant suffers from post-traumatic stress disorder, substance abuse, or psychological problems as a result of that service." Section 1170.9,

---

[6] A 2010 amendment to section 1170.9 made changes that are not relevant to our discussion here. (Stats. 2010, ch. 347, § 1.)

subdivision (b) provided, "If the court concludes that a defendant convicted of a criminal offense is a person described in subdivision (a), and if the defendant is otherwise eligible for probation and the court places the defendant on probation, the court may order the defendant into a local, state, federal, or private nonprofit treatment program for a period not to exceed that which the defendant would have served in state prison or county jail, provided the defendant agrees to participate in the program and the court determines that an appropriate treatment program exists."

■ To come within the applicable version of former section 1170.9, the following conditions must be satisfied: (1) the defendant must have served in combat while a member of the United States Armed Forces; (2) the defendant must suffer from PTSD, substance abuse, or psychological problems as a result of that service; (3) the defendant must be eligible for probation; (4) the court must place the defendant on probation; (5) there must be an appropriate local, state, federal, or private nonprofit program that can treat the defendant; and (6) the defendant must agree to participate in that program. If those requisites have been met, the trial court then has *discretion* to order the defendant into the treatment program for a period not to exceed that which he would have served in prison. (*People v. Bruhn* (1989) 210 Cal.App.3d 1195, 1199 [259 Cal.Rptr. 6].)

## B. *The Sentencing Hearing*

Ferguson's sentencing hearing was set for January 22, 2010. On December 18, 2009, he filed a motion for a presentencing section 1170.9 eligibility hearing. In the motion, Ferguson noted there was expert witness testimony at trial indicating he suffered PTSD as a result of his combat service in Iraq, and he would present additional evidence at the section 1170.9 hearing.

A minute order entered January 28, 2010, indicates that on December 18, 2009, the trial court issued an order asking for "preliminary briefing" to determine if it should hold such a presentencing hearing. The court observed section 1170.9 applied only "if the defendant is otherwise eligible for probation and the court places the defendant on probation." Accordingly, the court wanted briefing by January 6, 2010, addressing: "Is Ferguson eligible for probation? [¶] If not, is there any basis for a sentencing alternative under section 1170.9 or any other statute relating to PTSD? [¶] If not, should we hold the hearing requested by [Ferguson]?"

Apparently, the courtroom clerk failed to give notice to counsel of the court's request for briefing. Indeed, the minute order reflecting that request

was not entered until January 28, 2010. Nonetheless, on January 19, 2010, the prosecution filed its sentencing brief, which addressed section 1170.9. The prosecution argued sentencing under section 1170.9 would not be appropriate because although Ferguson was technically eligible for probation, probation was not appropriate in view of the gravity of the crimes (second degree murder, driving under the influence causing great bodily injury, and driving with a blood-alcohol level of 0.08 percent or higher causing great bodily injury). Additionally, the prosecution argued Ferguson could not establish his PTSD (or substance abuse) was the result of his military service, there was no alternative program that could deal with a defendant under an indeterminate sentence, and the Department of Corrections and Rehabilitation had programs designed to assist inmates suffering from PTSD or substance abuse.

A probation report was filed on January 22, 2010. It noted Ferguson's conviction for second degree murder carried a sentence of "15 years to life, which obviates any suitability for probation." Although the report did not specifically discuss alternative sentencing under section 1170.9, it quoted from a letter from the founder of a veterans substance abuse treatment program in San Diego that had offered to accept Ferguson "if he receives an alternate sentence."

Prior to the sentencing hearing on January 22, 2010, the court invited counsel to first address Ferguson's request for sentencing under section 1170.9. Defense counsel explained he was not going to present any evidence beyond that already introduced at trial, noting the trial court had already "heard all that it would need for whatever decision it's going to make." Defense counsel presented extensive argument as to the trial evidence he believed supported the conclusion Ferguson suffered PTSD as a result of his combat service, the availability of a treatment program, and why probation was authorized and appropriate in this case.

The prosecutor advised the court Ferguson was technically eligible for probation. The prosecutor repeated arguments from the sentencing brief, i.e., that probation was not appropriate in a second degree murder case, the trial evidence did not establish Ferguson's PTSD was a result of his having served in combat (as opposed to having resulted from the car crash itself), and there was not an appropriate treatment program.

The trial court then raised the issue on which it had requested briefing—i.e., whether Ferguson was in fact eligible for probation. The court noted its request for briefing on that issue had not been "circulated," but the problem had been "in some way ameliorated" by the prosecution's sentencing brief, which addressed eligibility. Nonetheless, the trial court referred to section

12022.53, subdivision (g), as a statute that might prohibit a grant of probation. That section imposes various enhancements for use of a firearm in the commission of certain felonies (including murder), and prohibits probation for anyone falling under its provisions. The prosecutor again took the position Ferguson was technically eligible for probation, but probation was inappropriate in a murder case.

The trial court then ruled it would not apply section 1170.9 for several reasons. First, the court continued to believe section 12022.53, subdivision (g), prohibited granting probation. Second, the court interpreted section 1170.9 as requiring not just that Ferguson claim to have "committed the offense as a result of post-traumatic stress disorder," but to demonstrate that to be the case, a conclusion the court could not reach in this case based on the trial evidence. Last, the court concluded that to invoke section 1170.9, "it must be a circumstance in which the court in fact does place the defendant on probation. That is an unlikely result this morning." The court went on to comment on the numerous letters it had received from the victims' family, friends, and associates, which had a "consistent theme" urging the court to impose the maximum possible term.

The trial court then moved on to the sentencing portion of the hearing during which defense counsel observed, "I think the court has ruled that probation is not appropriate. Therefore, we're left with an indeterminate minimum sentence . . . ." Although the court did not respond at that time, when imposing sentence it commented to defense counsel, "You're correctly perceiving . . . that the court previously expressed its thoughts about the option of a possible probationary sentence . . . ." The trial court then sentenced Ferguson to 15 years to life for the second degree murder count, a concurrent term for count 2 (driving under the influence causing bodily injury) and its attendant great bodily injury enhancement, and stayed sentence on count 3 (driving with a blood-alcohol level of 0.08 percent or more and causing bodily injury).

C. *Analysis*

The decision whether to grant or deny probation is reviewed under the abuse of discretion standard. (*People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831 [7 Cal.Rptr.2d 177]; *People v. Henderson* (1964) 226 Cal.App.2d 160, 163 [37 Cal.Rptr. 883].) "An order denying probation will not be reversed in the absence of a clear abuse of discretion. [Citation.] In reviewing the matter on appeal, a trial court is presumed to have acted to achieve legitimate sentencing objectives in the absence of a clear showing the sentencing decision was irrational or arbitrary. [Citations.]" (*People v. Martinez* (1985) 175 Cal.App.3d 881, 896 [221 Cal.Rptr. 258].)

Ferguson argues the matter must be remanded for resentencing because the court did not properly exercise its discretion under section 1170.9. He argues the court acted under the mistaken belief he was ineligible for probation under section 12022.53, subdivision (g). (See *In re Large* (2007) 41 Cal.4th 538, 550 [61 Cal.Rptr.3d 2, 160 P.3d 662] ["a discretionary sentencing decision rendered by a judge who did not understand what he was doing would not be sustainable as a proper exercise of discretion"].)

We agree with Ferguson that the trial court's reliance on section 12022.53 appears misplaced. Section 12022.53 provides sentence enhancements for a defendant who in the commission of enumerated felonies including murder (§ 12022.53, subd. (a)(1)), "personally uses a firearm" (§ 12022.53, subd. (b)), "personally and intentionally discharges a firearm" (§ 12022.53, subd. (c)), or "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death" (§ 12022.53, subd. (d)), and the statute prohibits granting probation to a defendant found to come within its provisions (§ 12022.53, subd. (g)). This case does not involve firearm use, and the indictment contains no section 12022.53 allegations. (See § 12022.53, subd. (j) ["[f]or the penalties in this section to apply, the existence of any fact required under subdivision (b), (c), or (d) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact"].)[7] The Attorney General implicitly concedes the section is inapplicable to preclude probation as he simply does not respond to Ferguson's argument concerning section 12022.53.

Nonetheless, we cannot say the trial court abused its discretion by declining to utilize section 1170.9's alternative sentencing scheme. Assuming the trial court was mistaken in its conclusion Ferguson was statutorily ineligible for probation under section 12022.53, subdivision (g), it was only one of three reasons the court gave for denying probation. A single valid reason suffices to justify a sentencing choice. (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1695–1696 [53 Cal.Rptr.2d 282], disapproved on other grounds in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123 [65 Cal.Rptr.2d 1, 938 P.2d 986].)

---

[7] The indictment did contain, and the jury found true, enhancement allegations as to count 2 (driving under the influence causing great bodily injury) and count 3 (driving with a blood-alcohol level of 0.08 percent or more and causing bodily injury) under section 12022.7, subdivision (a) (three-year enhancement for infliction of great bodily injury), within the meaning of section 1192.7 (limitation on plea bargaining) and section 667.5 (enhanced punishment for recidivists). The court imposed the three-year enhancement term and the sentence on count 2 to run concurrent with the sentence on count 1 (second degree murder count), and stayed the three-year enhancement term and sentence on count 3 pursuant to section 654.

Alternative sentencing under section 1170.9 is not triggered unless the court actually decides to grant probation. In amending the statute in 2006 to include PTSD and to expand its coverage from Vietnam combat veterans to all combat veterans, the Legislature made clear its intent was not to expand probation eligibility, but only "to ensure that judges are aware that a criminal defendant is a combat veteran with these conditions at the time of sentencing and to be aware of any treatment programs that exist and are appropriate for the person at the time of sentencing *if a sentence of probation is appropriate.*" (Stats. 2006, ch. 788, § 1(g), italics added.) It is clear from the record that even if Ferguson were statutorily eligible for probation, the trial court would not grant probation as it was not appropriate in view of the severity of the crimes and the input it had received from the victims' family, friends, and associates.

The trial court also denied probation because it did not believe the evidence demonstrated Ferguson committed the offenses *because of* combat-related PTSD. Ferguson argues he was denied due process because the court's request for briefing was never served on him and thus he never had an opportunity to address this issue. There was no due process violation.

The court's unserved minute order indicated it had wanted briefing on whether Ferguson was eligible for probation. Ferguson erroneously equates the court's request for briefing on probation *eligibility* with a request for further briefing on whether Ferguson suffered from PTSD or whether he committed the offenses as a result of PTSD. It is clear from the court's minute order it was interested in the threshold issue of statutory eligibility for probation. Although Ferguson was not alerted to the trial court's concerns in this regard, at the section 1170.9 hearing, both Ferguson and the prosecution argued Ferguson was eligible for probation; the prosecution argued it was not appropriate under the circumstances. As already discussed, although the trial court erroneously concluded Ferguson was statutorily ineligible for probation, it had other valid reasons for denying probation as well that support its sentencing decision.

This is not a case in which the court failed to hold a hearing to assess whether Ferguson was a person described by section 1170.9, subdivision (a). Prior to sentencing, the court considered section 1170.9, with Ferguson arguing he was relying on the trial evidence with regard to PTSD, and he did not have any additional evidence to present. Based on the trial evidence, the court concluded Ferguson had not established he committed the offenses as a result of combat-service-related PTSD. Ferguson has not demonstrated the court abused its discretion in reaching that conclusion.

## DISPOSITION

The judgment is affirmed.

Bedsworth, Acting P. J., and Ikola, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 27, 2011, S193549. Werdegar, J., did not participate therein.