Filed 9/12/23  P. v. Martinez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOVANY EFRAIN MARTINEZ,<br><br>　　Defendant and Appellant. | D080802<br><br><br>(Super. Ct. No. FWV20004476) |

APPEAL from a judgment of the Superior Court of San Bernardino, Jon D. Ferguson, Judge.  Affirmed.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christine Y. Friedman and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.


A jury convicted Jovany Efrain Martinez of second degree murder for the death of Eduardo Castellanos.  On the day of the murder, Castellanos

tore down a sign for a make-shift restaurant operated by Martinez's sister and brother-in-law on their residential property. This resulted in a confrontation between Castellanos and Martinez. Martinez stabbed Castellanos multiple times, which resulted in his death.

On appeal from the judgment of conviction, Martinez argues the trial court prejudicially erred by failing to instruct the jury on the offense of involuntary manslaughter based on the theory that Martinez negligently killed Castellanos while lawfully defending his sister and brother-in-law's property. We agree with the People that there was not substantial evidence to support this theory and, therefore, the trial court's failure to give an instruction was not error. Accordingly, the judgment of conviction is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

Martinez's sister (sister) and her husband (brother-in-law) operated a taco stand at their home in Ontario, California on the weekends to earn extra income. They prepared and served food under canopies on the side of their house, which fronted a busy four-lane street. To advertise their stand, sister and brother-in-law put a sign on the opposite side of the street. The sign consisted of a poster with Christmas lights strung across the top, which sat on an old, broken table. The sign said, "Rico's Tacos" and had an arrow directing passersby to the stand located between 50 and 60 feet away.

At the time of the murder, Martinez had been living with his sister and brother-in-law (as well as his father and sister and brother-in-law's three young children) for about six weeks. On the day of the incident, brother-in-law was preparing food shortly before the taco stand opened and noticed a loud car driving up and down the street. Shortly after, sister and brother-in-law saw Castellanos walking up and down the sidewalk, screaming in their

2

direction for no apparent reason.  Brother-in-law and sister could not make out what Castellanos was yelling and tried to ignore him as they prepared to open the taco stand.  Brother-in-law thought Castellanos "was just another guy having issues walking by" and "having a bad day or something . . . ."

At some point brother-in-law and sister saw Castellanos was back in his car, and brother-in law heard the sound of squealing tires as Castellanos again drove up and down the street.  This prompted brother-in-law and sister to move away from the street.  They could see that Castellanos's car had come to a stop in front of the sign across the street.  They watched Castellanos grab the sign and throw it to the ground.  Castellanos was yelling as he threw the sign.  Brother-in-law could not understand what Castellanos was saying, but sister thought he yelled, "Fuck you" or "Fuck your tacos." Sister yelled, "Hey" back to Castellanos.  Brother-in-law and sister both turned to walk toward Castellanos to confront him.

Martinez was outside while Castellanos was driving up and down the street, and when Castellanos threw the taco stand sign.  As Castellanos threw the sign, Martinez shouted, "Why are you throwing that, that's my family's stuff," and broke into a sprint towards Castellanos.  Sister screamed at Martinez to stop because she did not want her brother to get involved.  She and her husband continued toward Martinez, who had already reached Castellanos.

When Martinez reached Castellanos, he was facing away from Martinez.  Brother-in-law was unsure who started the fight, and he did not see the victim turn around, but at some point he saw the two men "squared up" or "hunched over" as they exchanged blows.  Sister and brother-in-law crossed the street in order to break up the fight, but were slowed by the

traffic. By the time they arrived, Martinez and Castellanos were separated and Castellanos was walking towards his car.

As Martinez and Castellanos walked away from the scene of the fight, brother-in-law saw blood on Castellanos's shirt. Brother-in-law and sister also saw a knife on the ground, and sister kicked it towards the downed sign. Sister then picked up the knife along with the sign. As sister and brother-in-law walked back to their house, they saw Castellanos get back into his car and begin to drive away.

Castellanos's car then came to a stop after traveling about 100 feet. Martinez's younger brother was at the family's house and when sister saw him after the incident, she told him to throw away or hide the knife she had retrieved. Brother-in-law told his wife to call 9-1-1. She told the dispatcher that Castellanos had been holding the knife. However, during her trial testimony, sister acknowledged that she did not know who was in possession of a knife at the time of the 9-1-1 call.

Sister also admitted that she initially failed to tell the detectives what she had done with the knife during an interview at the police station after the incident. Sister then admitted later in the same interview that she picked up the knife and told her younger brother to dispose of it.[1] Martinez's younger brother testified that he did not see any blood on the knife, but that he cleaned the knife before placing it in the flowerpot where it was later discovered by police.

Police arrived at the scene and during a search of the home, detectives found a light red rag in the kitchen sink that was wet and soapy. They also found a folding knife with a two-and-a-half inch blade and a three-inch

---

[1] During cross-examination, sister stated that she was testifying under the terms of an immunity agreement.

handle in a flowerpot near the home's fence, a slightly smaller folding knife in a hallway linen closet, and a third knife with a six-inch blade and a three-inch handle in the bedroom Martinez shared with his father.

The responding officers found Castellanos behind the wheel of his car, unresponsive. He was transported to a hospital emergency room and pronounced dead. A forensic pathologist testified that Castellanos had five different knife wounds—one to the left chest, a second to the upper midline back, a third to the left upper back, a fourth to the right chest, and a fifth below his right armpit. The pathologist testified that the fifth wound's characteristics suggested the knife was twisted before it was withdrawn. The injury to Castellanos's left chest was four inches deep and punctured his heart. The injury to the left upper back was three inches deep and punctured Castellanos's lung. The pathologist testified that these two injuries were both fatal.

After the close of the prosecution's case, the defense rested without introducing any additional evidence. The jury was instructed on self-defense as justification for murder, voluntary manslaughter based on unlawful killing committed in the heat of passion, voluntary manslaughter based on imperfect self-defense or defense of another, and malice—either express or implied—second-degree murder. The defense did not request, and the court did not give, an instruction on involuntary manslaughter.

After closing arguments and deliberations, the jury convicted Martinez of second degree murder (Pen. Code, § 187, subd. (a)[2]) and found true the allegation that he personally used a deadly and dangerous weapon during the commission of the murder (§ 12022, subd. (b)(1)). At a subsequent hearing, the court imposed an indeterminate sentence of 15-years to life and a

[2]    Subsequent undesignated statutory references are to the Penal Code.

determinate, consecutive one-year term for the deadly weapon enhancement. Martinez timely appealed.

## DISCUSSION

Martinez's sole contention on appeal is that the trial court prejudicially erred by failing to instruct the jury on involuntary manslaughter based on a theory that he killed Castellanos while protecting the property of his family. The Attorney General responds that the trial court did not err in not giving such an instruction because there was no evidence presented to support this theory of liability. Alternatively, the Attorney General asserts that any error was not prejudicial because the jury declined to convict Martinez of voluntary manslaughter, establishing it found Martinez acted with malice.

### I

### *Legal Principles*

### A

### *Standard of Review*

"The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater. . . . This instructional requirement ' "prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.' " ' " (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29–30 (*Brothers*).)

The duty to instruct does not arise if there is " '*any* evidence, no matter how weak' " in support of the lesser offense, but rather only arises if there is

6

evidence " 'substantial enough to merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 162.)  Substantial evidence exists if there is evidence that a reasonable jury could find persuasive.  (*Ibid*.; see also *People v. Blair* (2005) 36 Cal.4th 686, 745 ["To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist."].)  In deciding whether there is substantial evidence to warrant the instruction, the court should not evaluate the credibility of witnesses and should resolve doubts in favor of giving the instruction.  (*Ibid*.; see *People v. Strozier* (1993) 20 Cal.App.4th 55, 63.)  If the evidence in support of the lesser offense is " 'minimal and insubstantial,' " however, the court need not give the instruction.  (*People v. Barton* (1995) 12 Cal.4th 186, 201.)

"We review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant [citation]."  (*Brothers, supra*, 236 Cal.App.4th at p. 30.)

B

*Murder & Manslaughter*

"California law separates criminal homicide into two classes:  the greater offense of murder and the lesser offense of manslaughter.  [Citation.]  Murder is defined as 'the unlawful killing of a human being . . . with malice aforethought' (§ 187, subd. (a)), while manslaughter is defined as 'the unlawful killing of a human being without malice' (§ 192).  Thus, the 'distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice.'  [Citation.]  Malice exists

7

when 'an unlawful homicide was committed with the "intention unlawfully to take away the life of a fellow creature" (§ 188), or with awareness of the danger and a conscious disregard for life.' " (*People v. Schuller* (2023) 15 Cal.5th 237, 252 (*Schuller*).)

"[M]alice may be express or implied. [It] is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) "It is implied when the defendant engages in conduct dangerous to human life, ' "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*Brothers, supra*, 236 Cal.App.4th at p. 30.) Second degree murder is an unlawful killing with malice, but without the willfulness, premeditation, and deliberation necessary for first degree murder. (§§ 187, subd. (a), 189; *People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697.)

Voluntary and involuntary manslaughter are both lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) Voluntary manslaughter occurs "when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter." (*People v. Bryant* (2013) 56 Cal.4th 959, 968.) "California law recognizes two circumstances where 'a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill' [citation]: (1) when a person kills ' " 'in a "sudden quarrel or heat of passion" [citation], or . . . [(2) when a person] kills in "unreasonable self-defense"— the unreasonable but good faith belief in having to act in self-defense [citations].' " ' [Citation.] 'These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter "by *negating* the element of malice that

8

otherwise inheres in such a homicide [citation].” ’ ” (*Schuller, supra*, 15 Cal.5th at p. 252.)

Involuntary manslaughter is an unlawful killing without malice “in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.” (§ 192, subd. (b); see *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1082.) Thus, the mental state for involuntary manslaughter differs from the mental state for implied malice murder. “ ‘Implied malice contemplates a subjective awareness of a higher degree of risk than does gross [(i.e., criminal)] negligence, and involves an element of wantonness which is absent in gross negligence. [Citations.]’ [Citation.] ‘A finding of gross negligence is made by applying an *objective* test: if a *reasonable person* in defendant’s position would have been aware of the risk involved, then defendant is presumed to have had such an awareness. [Citation.] However, a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard.’ ” (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1141–1142*; People v. McNally* (2015) 236 Cal.App.4th 1419, 1426 [“ ‘[T]he state of mind of a person who acts with conscious disregard for life [(i.e., implied malice)] is, “I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.” ’ ”].)

“The words ‘without due caution and circumspection’ [in section 192, subdivision (b)] refer to criminal negligence—unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the consequences. [Citation.] If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts

9

in total disregard of the danger, the defendant is guilty of murder based on implied malice." (*People v. Evers* (1992) 10 Cal.App.4th 588, 596.) Thus, the pivotal questions here are whether there was sufficient evidence for a reasonable juror to find both that Martinez did not intend to kill—i.e., that he lacked malice—and that he did not consciously realize the risk to Castellanos's life posed by his conduct. (*Ibid.*)

II

*Analysis*

Martinez asserts that evidence presented during the trial required the court to provide the jury with an instruction on involuntary manslaughter based on his theory that he was criminally negligent in defending his sister and brother-in-law's sign. As stated, in order for this instruction to have been required, there must have been evidence that Martinez did not intend to kill Castellanos and that he did not appreciate the risks of his conduct, specifically stabbing Castellanos five times. We do not agree with Martinez that there is evidence in the record to support these factual contentions.

The testimony Martinez cites to support his argument is his brother-in-law's statement that before the stabbing he heard Martinez yell to Castellanos, "why are you throwing that, that's my family's stuff," and his sister's more ambiguous testimony that Martinez ran towards the victim as soon as the victim threw down the sign. As an initial matter, this evidence does not support an inference that Martinez was protecting the sign at the time he attacked Castellanos. Rather, the evidence at trial was that Castellanos had already thrown the sign down by the time Martinez reached him. The witness testimony relied on by Martinez does not contradict this fact and no evidence in the record shows that Castellanos was attempting to

10

engage in any further destruction of property or harm at the time Martinez encountered him.

In addition, the evidence establishing Castellanos's cause of death conclusively showed that Martinez harbored, at minimum, an implied intent to kill. The forensic pathologist that examined Castellanos's body found he had five different knife wounds, including one whose characteristics showed the knife was twisted before it was withdrawn and one that went four inches deep into Castellanos's left chest wall and pierced his heart. Unlike an accidental death occurring in the context of a beating, the stabbing in this case posed an inherent and obvious risk of death. (See *People v. Vasquez* (2018) 30 Cal.App.5th 786, 796 ["California courts have long recognized that not all beatings are life-threatening. 'Normally, hitting a person with the hands or feet does not constitute murder in any degree. [Citations.] But if death . . . is a reasonable or probable consequence of the beating the offense may be murder.' "].) Further, and critically, there is no evidence in the record that suggests Martinez did not appreciate the risk to life caused by stabbing Castellanos five times or that he did not intend to cause life-threatening injuries. To the contrary, the uncontradicted pathology evidence presented at trial conclusively established that Martinez engaged in conduct the natural consequences of which were dangerous to human life and that he consciously disregarded that risk.[3]

Because "[t]here was no evidence of an accidental killing, gross negligence[,] or [Martinez]'s own lack of subjective understanding of the risk to . . . life that [his] conduct posed . . . the trial court had no sua sponte duty to instruct the jury on involuntary manslaughter." (*Brothers, supra*, 236

---

[3] The jury's rejection of voluntary manslaughter based on imperfect self-defense likewise supports this conclusion.

11

Cal.App.4th at p. 34; see also *People v. Guillen* (2014) 227 Cal.App.4th 934, 1028 [involuntary manslaughter instruction unwarranted when the evidence left no room for reasonable doubt that the defendant acted with intent to kill or conscious disregard for human life].)  Accordingly, the court's failure to give the instruction in this case was not error.  (See *Brothers,* at p. 35 [when "the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter"].)[4]

DISPOSITION

The judgment of conviction is affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

---

[4]     Because we conclude the trial court's failure to give an instruction on involuntary manslaughter was not error, we do not reach the question of prejudice.

12