Filed 10/21/15  P. v. Gallegos CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MIRANDA MAE GALLEGOS,<br><br>    Defendant and Appellant. | D065337<br><br><br><br>(Super. Ct. No. SCS255820) |

THE COURT:

It is ordered that the opinion filed herein on October 5, 2015, be modified as follows:

1.     On page 15, third line from the bottom of the page, immediately before the sentence beginning "According to the defendant," add the following sentence:

We begin by accepting defendant's testimony that she was voluntarily

intoxicated.

2.     On page 17, in the first line, after the first semicolon, add the phrase "that she 'can't tell you how' she did it;" so the line reads:

happened really fast"; that she "can't tell you how" she did it; that she "just reacted"; that "[t]here was no thought process" to

3. On page 18, in the first full paragraph, delete the phrase "For these reasons, because" and insert instead: "For these reasons — after considering the entire record in a light most favorable to defendant's contention that she was unconscious (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1137) — we conclude that"; **additionally, in the second line of the same paragraph**, after the word "Humbert" insert a sentence-ending period followed by the word "Accordingly" so the paragraph now reads in full:

> For these reasons — after considering the entire record in a light most favorable to defendant (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1137) — we conclude that the record does not contain substantial evidence that defendant was unconscious when she stabbled Humbert. Accordingly, the trial court did not err in failing to instruct the jury on voluntary intoxication causing unconsciousness.

4. On page 19, footnote 8, in the fourth line, change the word "his" to "her" so the line reads:

> bases her constitutional argument on the suggestion that, where intoxication has been

There is no change in the judgment.

2

Appellant's petition for rehearing is denied.

HALLER, Acting P. J.

Copies to: All parties

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D065337 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS255820) |
| MIRANDA MAE GALLEGOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Stephanie Sontag, Judge.  Affirmed.


Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Lisa S. Jacobson and Tami F. Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Miranda Mae Gallegos (defendant) of the first degree murder of Scott Humbert (Pen. Code, § 187, subd. (a); further undesignated statutory references are to the Pen. Code) and found true the allegation that she used a dangerous or deadly weapon, namely a knife, in the commission of the murder (§ 12022, subd. (b)(1)). In a bifurcated proceeding following the verdict, defendant admitted the truth of a charged prior prison conviction (§ 667.5, subd. (b)).

The trial court sentenced defendant to prison for 25 years to life for the murder, plus one year each for the section 12022, subdivision (b)(1) enhancement and the section 667.5, subdivision (b) enhancement, and imposed certain fines and fees. Defendant timely appealed.

On appeal, defendant raises four issues: (1) whether the trial court erred in failing to instruct sua sponte on involuntary manslaughter, as a lesser included offense of murder, based on unconsciousness due to voluntary intoxication; (2) whether the trial court erred in excluding a digital versatile disc (the DVD) containing recorded evidence of defendant's emotional reaction upon being told of Humbert's death during a postarrest interview; (3) whether trial counsel rendered constitutionally ineffective assistance by failing to request an instruction that would have informed the jury of the effect of provocation in reducing first degree murder to second degree; and (4) whether the cumulative prejudicial effect of these errors deprived defendant of due process and a fair trial. Because defendant did not meet her burden of establishing reversible error, we will affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

We review the record and recite the facts in a light most favorable to the judgment. (*People v. Hill* (1998) 17 Cal.4th 800, 848-849.) There was never an issue as to the cause of Humbert's death: around 7:45 p.m. on April 1, 2012, defendant stabbed Humbert with a knife, and he died later that evening as a result of a single stab wound that passed through two of his ribs and entirely through his heart.

A. *Introduction*

At the time of his death, Humbert was 25 years old, defendant was 35 years old, and they had known each other for approximately three years. Throughout most of this time, they had a romantic relationship living together, but they often would argue, break up and get back together. There was evidence that, during their relationship, Humbert and appellant loved each very much, and Humbert could act jealously with or without cause. On a daily basis, they both received methadone and used illicit drugs (mostly heroin and methamphetamine); defendant also had a prescription for the drug Klonopin, an antianxiety medication.

Just days before his death, Humbert moved out of the room he had been sharing with defendant at a house in La Mesa and moved in with his mother, Dorothy Ortiz-Tello, who lived in a house on Paradise Drive in National City. Humbert had moved back to his mother's house, because from his perspective the relationship with defendant was over; consistently, defendant understood that Humbert had left her.

3

Ortiz-Tello lived with and took care of her aging mother (Humbert's grandmother), who suffered from dementia. At the time Humbert moved into Ortiz-Tello's house in late March 2012, one of Ortiz-Tello's brothers, Thomas Ortiz (Humbert's uncle), was staying there; and Humbert and Ortiz shared a room off the kitchen. Marcos and Sara Rodriguez lived immediately next door to Ortiz-Tello.

B.    *The Homicide*

Immediately preceding their break-up, Humbert, defendant and Marlon San Juan (a friend of Ortiz-Tello's boyfriend) were smoking methamphetamine in a room at the house in La Mesa. Humbert and defendant began fighting, Humbert decided to move back to Ortiz-Tello's, and San Juan drove him there.

A day or two later — during the late afternoon and early evening of April 1, 2012 — Ortiz-Tello's house was full: Ortiz-Tello was in the kitchen cooking dinner; Ortiz-Tello's mother was in her room off to one side of the kitchen; Humbert and Ortiz were in their living area off to another side of the kitchen, watching TV and talking; and Ortiz-Tello's boyfriend was in a lower level of the house playing the guitar. Ortiz-Tello answered two telephone calls from defendant, who asked to speak with Humbert. Because Humbert had told Ortiz-Tello that he did not want to talk with defendant, in the first call Ortiz-Tello told defendant that Humbert was not there. Defendant's response indicated to Ortiz-Tello that defendant did not believe her. Defendant called back, telling Ortiz-Tello that she (defendant) was coming to the house and "if something happens to [Humbert], that's on him."

4

Ortiz-Tello, who was upset there might be trouble, told Humbert about the calls; he told her not to worry, assuring her that he would handle the situation. Approximately 30-45 minutes later, defendant arrived at Ortiz-Tello's house. According to defendant, at this point in time she had been up for days, doing heroin every six hours and smoking methamphetamine at least every four hours — in addition to taking the prescribed methadone and Klonopin.

Defendant knocked on the side door, which was on a small porch next to the kitchen, outside of the room where Humbert and Ortiz were living. (The front door led into a living room, which Ortiz-Tello and her mother used as their bedroom.) Ortiz-Tello remained in the kitchen, while Humbert left the room he shared with his uncle, opened the side door, stepped out onto the porch and closed the door behind him. Concerned about Humbert's safety, Ortiz-Tello hurried to the door and put her ear to the crack to listen. Ortiz-Tello heard defendant say to Humbert, "He raped me, and you're not going to do anything about it? I could kill you right now, you know."

The doorknob then wiggled, startling Ortiz-Tello and causing her to retreat toward the kitchen so as not to be caught eavesdropping. Humbert entered, closing the door behind him with one hand and holding his chest over his heart with the other hand. In response to Ortiz-Tello's inquiry to Humbert whether he was all right, without saying anything Humbert lifted his hand off his chest, looked at his hand as a stream of blood spurted out of his chest, and quickly replaced his hand on his chest.

Shock and panic followed. Ortiz-Tello screamed loudly, "she stabbed him, she stabbed him," and yelled to Ortiz for help. All of this unnerved Ortiz-Tello's elderly

5

mother in the next room, and she began to cry. While Ortiz-Tello was attempting to calm her mother, Ortiz called 911 at 7:48 p.m. Humbert then made his way through the kitchen into Ortiz-Tello's bedroom and out the front door, saying "I got to go" — which Ortiz-Tello understood to mean to go "to the hospital."

Once Humbert came outside, defendant marched up the driveway (from the street to the house) toward him, taking big steps and swinging her arms. Defendant was upset, and when she reached Humbert, defendant began yelling directly into his ear and gesturing wildly. Humbert, while still holding his hand over his chest, tried to get away from defendant by turning his back on her and heading toward the house. As Humbert entered the house, Ortiz-Tello followed him in, slamming and locking the iron screen door so as to keep defendant outside. At this point, defendant and Ortiz-Tello exchanged insults, each calling the other various names and using extremely profane language. According to defendant, because she did not want to hear Ortiz-Tello's hysteria, she turned and left, going down the driveway to the street and walking north on Paradise Drive.

Defendant testified that when she left Ortiz-Tello's residence, she (defendant) did not know she had hurt Humbert, despite the facts that: Humbert had asked her "Why did you stab me?" before he returned to the house for the first time; Ortiz-Tello had accused her of stabbing Humbert through the locked screen door during the profanity-laced exchange immediately before defendant left; and there was a trail of blood on the ground where Humbert and defendant had just been talking in the driveway.

6

Once defendant left, Humbert again went outside to the driveway, soon receiving assistance from Ortiz and Ortiz-Tello's boyfriend. Ortiz was helping Humbert stand upright, and the boyfriend had gotten a towel and was compressing it on the wound. Humbert meanwhile was dragging himself to the next door neighbors' (the Rodriguezes') front door, which was just steps away from the driveway. Humbert pounded on the door, and by the time Mr. Rodriguez answered, Humbert collapsed. Mr. Rodriguez took over, physically carrying Humbert, as Ms. Rodriguez drove their car down the driveway so that Mr. Rodriguez could place Humbert across the back seat in order to transport him to a hospital. By the time they reached the street, police officers had responded to the 911 call, and the officers ordered the Rodriguezes to pull over and wait for the paramedics who arrived a minute later.

Humbert died at the hospital at 9:18 p.m. on April 1, 2012. The cause of death was a single stab wound on the left side of his chest, which was indicated by a track from an instrument, "possibly a knife," that had passed through a space between two ribs and entirely through his heart.

In the meantime, as soon as defendant left Ortiz-Tello's house, she called a friend for a ride, telling him that she thought she might have stabbed someone. She then walked behind the house and a bridge, where she ditched the knife she had been carrying. From there, defendant walked to a market and bought cigarettes at 7:56 p.m. — which was less than 10 minutes after Ortiz had called 911. Defendant made another call for a ride, this time to San Juan. As she wandered around the streets waiting for San Juan, defendant ran into an acquaintance (from a prior incarceration), Stacey Bancroft. Bancroft explained

7

that she needed a ride,[1] and defendant explained that she needed a place to stay; and they agreed that after defendant helped Bancroft get to where she was going, defendant could stay with Bancroft in her hotel room. Waiting for San Juan to pick them up, defendant went to a liquor store and bought a beer. Eventually, San Juan got them, took them to where Bancroft wanted to go and then drove them both to Bancroft's hotel room, where they all smoked methamphetamine. San Juan left the women in the hotel room, whereupon Bancroft also left, and defendant remained behind making telephone calls. Bancroft was not gone very long, but by the time she returned, police were at the hotel; shortly thereafter, the police knocked on the door of the room where the two women were staying, and Bancroft opened the door.

The police arrested defendant, advising her that she was under arrest for murder. A later toxicology report revealed that approximately eight hours after the stabbing, defendant had in her system amphetamines (methamphetamine and amphetamine), opiates (morphine and codeine)[2] and benzodiazepines (Xanax, Klonopin and 7-amino Clonazepam).[3]

---

[1] At the time, Bancroft was a prostitute, and she needed a ride to meet a client.

[2] The People's forensic toxicologist testified that the amounts of morphine and codeine found in defendant's system indicated use of heroin that had metabolized.

[3] A toxicology report revealed that at the time Humbert was brought to the hospital, he had heroin and methamphetamine in his system.

C.    *The Trial*

The case proceeded to trial over the course of nine days in January 2014. The parties called over 20 witnesses and introduced nearly 100 exhibits into evidence.

We described the principal facts of the People's case immediately above. The defense theory was that defendant stabbed Humbert by accident. Defendant testified that at the time of the incident, she was "very intoxicated," did not remember stabbing Humbert and never intended to hurt him.

According to defendant, she went to Ortiz-Tello's house on April 1, 2012, to work things out with Humbert to the point where, even if they remained broken up, they still would be friends. As they talked near the side door, Humbert began raising his voice when he found out that San Juan had just driven defendant to Ortiz-Tello's for this confrontation. Defendant then saw that Humbert had a knife in his hand, as he looked up the street for San Juan. Concerned, defendant pulled out a knife that she was carrying in her purse. According to defendant, as Humbert then came toward her, she felt like she was going to trip over a bump in the cement as she was backing up. At that point, "everything . . . happened really fast" — with defendant thinking that she may have pushed Humbert. At the time, defendant did not understand why Humbert had asked her why she stabbed him, because she did not understand that he had been hurt. Humbert then told defendant that he loved her and to "hold on," as he turned and went back into the house through the side door. Even when he returned to the driveway moments later (after he had been inside the house, where he spurted blood when he lifted his hand off his chest), he appeared normal to defendant.

9

The jury was instructed on four potential verdicts: first degree murder, second degree murder, voluntary manslaughter (heat of passion) and involuntary manslaughter (lawful act in an unlawful manner with criminal negligence).

The jury found defendant guilty of first degree murder and found true the allegation that she used a dangerous or deadly weapon, a knife, in the commission of the murder.[4]

## II.

## DISCUSSION

On appeal, defendant raises three independent issues and a fourth argument that the cumulative prejudicial effect of those errors deprived her of due process and a fair trial. None suggests a basis on which to reverse the judgment.

A.    *Jury Instruction*

Defendant argues that the trial court erred in failing to instruct sua sponte on involuntary manslaughter, as a lesser included offense of murder, based on unconsciousness due to voluntary intoxication. Defendant contends that, because this theory was supported by substantial evidence, the court was required to instruct with CALCRIM No. 626 (or a substantially similar instruction).

---

[4]    The clerk's minutes indicate the result of the polling of the jurors was "10 YES   0 NO." However, the reporter's transcript confirms that all 12 jurors answered "Yes" to the question "Was this and is this your verdict?" and that the clerk "record[ed] 12 affirmative responses." Because no party raises any issue and because there is nothing to indicate the reporter's transcript may be inaccurate, "we presume the court reporter accurately reported the proceedings." (*People v. Anzalone* (2013) 56 Cal.4th 545, 552, fn. 6.)

10

CALCRIM No. 626 is entitled "Voluntary Intoxication Causing Unconsciousness:

Effects on Homicide Crimes (Pen. Code, § 29.4[5])" and provides in full:

"Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions.

"A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

"Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:

"1. The defendant killed without legal justification or excuse;

"2. The defendant did not act with the intent to kill;

"3. The defendant did not act with a conscious disregard for human life;

---

5    "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.
   "(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.
   "(c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance." (Pen. Code, § 29.4.)

11

"AND

"4.  As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious.  If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] voluntary manslaughter)."

1.     *Law*

Involuntary manslaughter is "the unlawful killing of a human being without malice" "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  (§ 192, subd. (b).)  Our high court has described involuntary manslaughter as "criminally negligent unlawful homicide." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423 (*Ochoa*).)  Involuntary manslaughter is a lesser included offense of murder.  (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)

Because "*every*" lesser included offense that is supported by substantial evidence "must" be presented to the jury, a trial court *must* "instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence."  (*People v. Breverman* (1998) 19 Cal.4th 142, 155, 162 (*Breverman*).)  In this context, substantial evidence means " ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed."  (*Id.* at p. 162.)  In determining the substantiality of evidence, a trial court is to consider only the "legal sufficiency" of the evidence, not its weight or the credibility of the witnesses who presented the evidence.  (*Id.* at p. 177.)

12

Thus, as applicable here, a person who is charged with murder is entitled to a sua sponte instruction on involuntary manslaughter "when there is evidence deserving of consideration that the defendant was unconscious due to voluntary intoxication."[6] (*Halvorsen*, *supra*, 42 Cal.4th at p. 418.) Under this standard: voluntary intoxication is "the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance" (§ 29.4, subd.(c)); and an unconscious act " 'is one committed by a person who because of [voluntary intoxication] is not conscious of acting and whose act therefore cannot be deemed volitional' " (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1083 (*Ferguson*)). In this latter regard, unconsciousness "need not mean that the actor lies still and unresponsive[;] . . . unconsciousness ' "can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting." ' " (*Ochoa*, *supra*, 19 Cal.4th at pp. 423-424.)

We do not take into consideration the trial court's inquiry and defense counsel's response that she was not arguing for an involuntary manslaughter instruction. Whenever substantial evidence supports an involuntary manslaughter finding based on unconsciousness due to voluntary intoxication, the trial court is required sua sponte to

---

[6] Where, in contrast, the unconsciousness results from other than voluntary intoxication, the unconsciousness is a complete defense to the charged crime. (§ 26, class Four; *People v. Halvorsen* (2007) 42 Cal.4th 379, 417 (*Halvorsen*).) The difference is that, if the unconsciousness results from intoxication *voluntarily* induced, " 'the requisite element of criminal negligence is deemed to exist irrespective of unconsciousness, and a defendant stands guilty of involuntary manslaughter if he voluntarily procured his own intoxication.' " (*Ochoa*, *supra*, 19 Cal.4th at p. 423.)

13

instruct the jury accordingly, regardless of the wishes of defense counsel. (*Halvorsen*, *supra*, 42 Cal.4th at p. 418; *Breverman*, *supra*, 19 Cal.4th at pp. 158, 162.)

We review de novo whether a jury instruction on the lesser included offense of involuntary manslaughter should have been given (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1367), viewing the evidence in a light most favorable to defendant (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137 (*Millbrook*)).

2.      *Analysis*

The record contains substantial evidence that defendant was voluntarily intoxicated for purposes of section 29.4, subdivision (c). At the time of the stabbing, defendant had been up for days, doing heroin every six hours, smoking methamphetamine at least every four hours and taking the prescribed methadone and Klonopin.

The only issue, therefore, is whether the record contains substantial evidence that defendant was unconscious. *Ochoa* is instructive in this regard.

In *Ochoa*, in addition to other crimes committed against other victims, Ochoa was charged with and convicted of the kidnap, rape and murder of Lacy Chandler. (*Ochoa*, *supra*, 19 Cal.4th at pp. 380-381.) At trial, the evidence supported Ochoa's argument that his consumption of "an unprecedented quantity of cocaine on the night of the murder caused him to lose his faculties." (*Id.* at p. 391.) In particular, on appeal Ochoa relied on a portion of his taped confession played for the jury, in which he stated: " 'I don't know what was going through my mind, I was so high.' " (*Id.* at p. 422.) Given this evidence,

14

Ochoa argued that the trial court erred by not sua sponte instructing the jury on involuntary manslaughter based on voluntary intoxication causing unconsciousness. (*Ibid.*)

The Supreme Court disagreed, focusing on Ochoa's actions immediately preceding the homicide. When Ochoa first approached Chandler, he "had the presence of mind" to tell her to be quiet, to display a knife and to take her to a secluded area. (*Ochoa*, *supra*, 19 Cal.4th at p. 424.) He asked her to remove her clothes, and when she later asked whether she could put them back on, he gave permission. (*Ibid.*) This, the court ruled, "show[ed] a methodical, calculated approach to the crimes." (*Ibid.*) Reflecting on the potential consequences of allowing Chandler to live, Ochoa then killed her — establishing malice aforethought, according to the court. (*Ibid.*) Ochoa was *not* entitled to an involuntary manslaughter instruction, because Ochoa's statement that he did not know what was going through his mind was "insufficient to permit a jury composed of reasonable individuals to find that he committed involuntary manslaughter." (*Ibid.*) At best, Ochoa's intoxication "clouded his judgment and caused him to make foolish choices"; it did not result in a lack of malice. (*Ibid.*)

Likewise, here too, while defendant's intoxication likely clouded her judgment and caused her to make foolish choices, the intoxication did not render defendant unconscious when she stabbed Humbert. (*Ochoa*, *supra*, 19 Cal.4th at p. 424; *Ferguson*, *supra*, 194 Cal.App.4th at p. 1083.) According to defendant, she was angry and upset when Humbert left her; and very early on April 1, 2012 (the date of the stabbing), she had texted her landlord that she felt like stabbing "the next dude who seems like he's fucking

15

with me."[7] That evening, defendant called Ortiz-Tello's house a number of times, and when she was not able to speak with Humbert, within less than an hour, she arranged for a ride to and arrived at the house in National City. According to defendant, her specific intent was to work things out, and hopefully remain friends, with Humbert once she got there. After Humbert came out to talk with her, defendant recalled explaining to him some of what she had done earlier in the day — specifically that she had gone to get money from one person and had used it to pay back another person — after which defendant and Humbert argued a bit about money. Defendant also remembered that what had been a normal conversation turned loud once Humbert found out that it was San Juan who had given her a ride to the house; indeed, she also remembered that, in reacting to this information, Humbert began looking up the street for San Juan. At this point, defendant testified, she saw a knife in Humbert's hand as he was asking about and looking up the street for San Juan — to which she responded by pulling out a knife that she was carrying in her purse. As Humbert then approached defendant with a knife in his hand, she recalled moving backward and feeling like she was going to go over a bump in the cement in the driveway. Of note, just seconds prior to the stabbing, defendant was able to recollect her exact thoughts: is Humbert mad at San Juan? is Humbert mad at her? and, why? Defendant then testified that she was "confused"; that "everything . . .

---

[7] Viewing this evidence in a light most favorable to defendant — as we must (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1137) — we accept defendant's testimony that, when she wrote those words, she did not intend them for Humbert. We nonetheless consider the statement as evidence of defendant's state of mind regarding the break-up and her propensity for the type of violence that occurred later the same day.

happened really fast"; that she "just reacted"; that "[t]here was no thought process" to harm Humbert; that "[i]t just happened and everything stopped"; and that she may have "pushed him or something." *This is the only time at which defendant's memory failed her.*

Significantly, despite her alleged unconsciousness at the time of the stabbing, defendant also was able to remember exactly what Humbert said and did *immediately after the stabbing*: he asked her why she stabbed him; he told her he loved her; she told him she loved him; and he told her to "hold on" as he turned around and went into the house. After Humbert went back inside, defendant also recalled walking up the street, calling a friend for a ride (and telling him that she thought she might have stabbed someone), going behind the house and a bridge, ditching the knife, walking to a market and buying cigarettes — *all of this within 10 minutes of the stabbing*.

Because a "[d]efendant's professed inability to recall the event, without more, [i]s insufficient to warrant an unconsciousness instruction . . ." (*People v. Rogers* (2006) 39 Cal.4th 826, 888 (*Rogers*)), we are not persuaded by defendant's argument. "The complicated and purposive nature of h[er] conduct" *both* before *and* after the stabbing "makes clear that [s]he did not lack awareness of h[er] actions during the course of the offense." (*Halvorsen*, *supra*, 42 Cal.4th at p. 418; see *People v. Heffington* (1973) 32 Cal.App.3d 1, 10 [no "ineluctable rule" that a defendant's inability to remember supplies an evidentiary foundation for an unconsciousness instruction].)

Nor are we persuaded by the authorities on which defendant relies, *People v. Bridgehouse* (1956) 47 Cal.2d 406 and *People v. Wilson* (1967) 66 Cal.2d 749. Although

in both cases the defendants did not recall shooting the victims (*Bridgehouse*, at pp. 410-411, 412; *Wilson*, at p. 755), both cases are distinguishable. In *Bridgehouse*, the defendant had a "very vague memory" of the victim rising from the couch prior to the shooting and his recollection of speaking with the victim just before the shooting was "very hazy"; the defendant did not remember taking out the gun or what he did with the gun after the shooting. (*Bridgehouse*, at pp. 410, 412.) In *Wilson*, the defendant did not recall what happened during the multiple shootings, did not remember shooting the gun in one of the rooms (and did not know at the time whether anyone was even in the room), and did not know where or when he was arrested shortly after the shootings. (*Wilson*, at pp. 755-756.) In contrast, here defendant testified in detail as to the events *immediately* preceding and *immediately* following the stabbing — including where her knife was at all times, except as it entered and exited Humbert's chest.

For these reasons, because the record does not contain substantial evidence that defendant was unconscious when she stabbed Humbert, the trial court did not err in failing to instruct the jury on voluntary intoxication causing unconsciousness.

In any event, even if we assume that the jury should have been instructed on the lesser included offense (involuntary manslaughter based on voluntary intoxication causing unconsciousness), we may reverse a judgment only if the error "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; see Code Civ. Proc., § 475.) We apply the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) to determine whether the failure to instruct on the lesser included offense resulted in a

18

miscarriage of justice requiring reversal.[8]  (*Id.* at pp. 832, 836.)  Under this standard,

such error is reversible only when there is a reasonable probability that the appellant

would have received a more favorable result had the instruction been given.  (*Id.* at

p. 836.)  For purposes of this analysis, a "reasonable probability" is one sufficient to

undermine the confidence in the conviction.  (*Strickland v. Washington* (1984) 466 U.S.

668, 694 (*Strickland*).)  "Such posttrial review focuses not on what a reasonable jury

*could* do, but what such a jury is *likely* to have done in the absence of the error under

consideration."  (*Breverman*, *supra*, 19 Cal.4th at p. 177.)  We may consider the relative

strength of the evidence in support of the judgment compared to the relative weakness of

the evidence in support of a different outcome.  (*Ibid.*)  The appellant bears the burden of

establishing prejudice.  (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

---

[8]  Defendant argues that the (assumed) error is of federal constitutional dimension, requiring a reversal unless we find beyond a reasonable doubt that the error was harmless under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  In part, defendant bases his constitutional argument on the suggestion that, where intoxication has been established, "absence-of-unconsciousness" is "an **essential element** of . . . of the charged murder offense."  We disagree.  "[C]onsciousness is not an element of the offense of murder (nor of any offense)."  (*People v. Babbitt* (1988) 45 Cal.3d 660, 693; accord, *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1321-1322.)  Rather, "[u]nconsciousness is a defense."  (*Babbitt*, at p. 693; accord, *Mathson*, at p.1321.)

In any event, our Supreme Court has rejected numerous times the suggestion that failure to instruct sua sponte on a lesser included offense requires a harmless error analysis under *Chapman*.  Quoting from *Breverman*, *supra*, 19 Cal.4th at pages 169, 178, the court recently explained:  Because " 'the rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives *exclusively* from California law[,]' . . . 'in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice *exclusively* under [*Watson*].' "  (*People v. Beltran* (2013) 56 Cal.4th 935, 955, italics added, citations omitted.)

19

In the present appeal, the alleged instructional error is harmless. Here, just as in *People v. Koontz* (2002) 27 Cal.4th 1041, "the jury necessarily decide[d] the factual questions posed by the omitted instruction[] adversely to defendant under other properly given instructions." (*Id.* at p. 1086.) " 'In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury.' " (*People v. Wright* (2006) 40 Cal.4th 81, 98.) The court instructed the jury on first or second degree murder with malice aforethought (CALCRIM No. 520); deliberation and premeditation for first degree murder (CALCRIM No. 521); voluntary manslaughter, heat of passion (CALCRIM No. 570); voluntary manslaughter, imperfect self-defense (CALCRIM No. 571); involuntary manslaughter, lawful act in an unlawful manner with criminal negligence (CALCRIM No. 580); and, significantly, effects of voluntary intoxication on homicide crimes (CALCRIM No. 625).

Thus, as relevant to our consideration of what the jury "is *likely* to have done" had it been instructed under CALCRIM No. 626 (*Breverman, supra,* 19 Cal.4th at p. 177), the jury was instructed in part as follows with regard to murder:

> "The defendant is charged in count 1 with murder in violation of Penal Code section 187. To prove that the defendant is guilty of this crime, the People must prove that . . . when the defendant acted, she had a state of mind called malice aforethought . . . . There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. The defendant acted with express malice if she unlawfully intended to kill. The defendant acted with implied malice if . . . she intentionally committed an act . . . the

20

natural and probable consequences of . . . were dangerous to human life. (Italics added; see CALCRIM No. 520.)

"The defendant is guilty of first degree murder if the People have proved that she acted willfully, deliberately, and with premeditation. The defendant acted willfully if she intended to kill. . . ." (Italics added; see CALCRIM No. 521.)

The jury was also instructed that it could consider evidence of defendant's voluntary intoxication "*in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation.*" (Italics added; see CALCRIM No. 625.)

Absent a showing to the contrary, we presume the jury followed the instructions given. (*People v. Harris* (2013) 57 Cal.4th 804, 857.)

Having convicted defendant of murder, therefore, the jury necessarily decided: (1) when she acted, she had malice aforethought — either she "intended to kill" Humbert (express malice) or she "intentionally committed an act" the natural consequences of were dangerous to human life (implied malice) (see CALCRIM No. 520); and (2) defendant's voluntary intoxication did not affect "whether the defendant acted with an intent to kill" (see CALCRIM No. 625). Likewise, having convicted defendant of murder in the first degree, the jury necessarily decided: (1) defendant "acted willfully, deliberately, and with premeditation" — with willfulness defined as an "inten[t] to kill" (see CALCRIM No. 521); and (2) defendant's voluntary intoxication did not affect "whether the defendant acted with an intent to kill or . . . with deliberation and premeditation" (see CALCRIM No. 625).

Given these findings as to first degree murder, we are satisfied that, had the jury been instructed under CALCRIM No. 626, the jury is not likely to have found that defendant's voluntary intoxication caused unconsciousness. Even without an instruction on unconsciousness, defendant "was permitted to use the same underlying facts to mitigate the crime. Thus, in finding defendant guilty of murdering [Humbert], the jury necessarily rejected defendant's [intoxication causing unconsciousness] defense." (*People v. Maury* (2003) 30 Cal.4th 342, 422; see *Rogers*, *supra*, 39 Cal.4th at p. 884 [because "[t]he jury rejected the lesser options and found defendant guilty of first degree premeditated murder . . . , there is no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option"].)

B.      *The DVD*

Defendant argues that the trial court erred in excluding the DVD.[9]  At trial, although the court did not view the DVD, defendant's counsel described it as "a video of [defendant] after she's arrested by the police when she is informed by Detective Villariasa that [Humbert]'s dead."  Defendant's attorney explained that she was offering this evidence of defendant's reaction to the news of Humbert's death to show the homicide

---

[9]      At defendant's request, we have viewed the DVD, trial exhibit 129.  There is no identifying information on the recording.  It is 43 minutes long and appears from context to have commenced at approximately 2:45 a.m. on April 2, 2012 (approximately seven hours after the stabbing).  At approximately 2:53 a.m., after advising defendant of her rights under *Miranda v. Arizona* (1966) 384 U.S. 436, an unidentified male voice tells defendant that Humbert is dead — after which defendant's reactions can be seen and heard.  These reactions include rocking and crying and other emotions with little, if any, verbal communications other than "Oh my God," "no way," "why, why," "no, no," "please, please," et cetera.

22

was neither premeditated nor deliberate.  The district attorney objected on the grounds that such evidence was irrelevant, cumulative and prejudicial.  (See Evid. Code, §§ 210, 350-352.)

Overruling the objections on those grounds, the court sua sponte sustained a hearsay objection, just as the district attorney indicated he was getting there.  The court reasoned that, because defendant's reaction was a statement, it was hearsay,[10] and that although such evidence might be admissible if *offered by the People* (presumably as an exception to the hearsay rule as a statement against a party (Evid. Code, § 1220)), it was inadmissible when *offered by defendant* in support of her case.

1.    *Law*

The hearsay rule precludes the admission into evidence of "a *statement* that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200, italics added.)  In this context, a " '[s]tatement' " is either an "oral or written verbal expression" or "nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression."  (*Id.*, § 225.)  Where, as argued by defendant, the evidence is "nonverbal, nonassertive, emotional behavior," it is not a substitute for oral or written verbal expression and, thus, is "not subject to the hearsay rule."  (*People v. Rogers* (2009) 46 Cal.4th 1136, 1162; see *People v. Jurado* (2006) 38 Cal.4th 72, 129 [because emotional displays were "nonassertive

---

10    We understand the court's comment to mean that defendant's reaction was an out-of-court statement being offered for the truth of the matter asserted for purposes of the hearsay rule, Evidence Code section 1200.

conduct," they were not hearsay]; *People v. Snow* (1987) 44 Cal.3d 216, 227 [after news of a death, silence and lack of emotion were "nonassertive responses or reactions" and thus not hearsay].)

We review for an abuse of discretion the trial court's determination to exclude evidence based on the hearsay rule. (*People v. Pirwani* (2004) 119 Cal.App.4th 770, 787.) Under this standard, the trial court's ruling will not be disturbed in the absence of a showing by defendant that the court exercised its discretion "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

2.      *Analysis*

We will assume without deciding that the trial court erred in ruling that the DVD contained hearsay.[11] For the reasons we explained in part II.A.2., *ante*, however, we will not reverse the judgment unless defendant meets her burden of establishing a reasonable

---

[11]    Relying on the principle that an appellate court should not reverse a correct legal ruling merely because the trial court gave an incorrect reason (citing *People v. Zapien* (1993) 4 Cal.4th 929, 976), the People argue that the DVD was properly excluded on the grounds that the evidence was irrelevant, cumulative and prejudicial. The problem with this argument is that the trial court overruled these objections, and the People do not attempt to establish that the rulings were erroneous — i.e., that they were an abuse of the trial court's discretion. (Code Civ. Proc., § 906 [appellate courts can review potential error on *respondent's* request for purpose of determining whether appellant suffered prejudice]; *Citizens for Uniform Laws v. County of Contra Costa* (1991) 233 Cal.App.3d 1468, 1472 [*respondent* may assert trial court error where, if established, the result is an affirmance].) By this argument, the People are asking that we rule as a matter of law that the DVD was irrelevant, cumulative and prejudicial — which we decline to do.

probability that she would have received a more favorable result had the evidence been admitted. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Initially, we disagree with defendant's characterization that the prosecution's case "was anything but a strong one." The People presented a solid case, as we set forth at part I.B., *ante*.

In attempting to establish prejudice, defendant argues that her emotional reaction on the DVD "would have constituted objective <u>corroborating</u> evidence supporting [her] testimony to the effect that she did not expect Humbert to die *until she was told he was dead*." (Italics added.) This argument is not supported by the record. The DVD shows defendant's emotions at almost 3:00 a.m. (See fn. 10, *ante*.) However, as defendant affirmatively acknowledges in her opening brief, she testified at trial that she was *first* told that Humbert died when the police detective arrested her *for murder* in Bancroft's hotel room, many hours before the events recorded on the DVD:

> "A:     . . . I think it was the detective right there, he tells me, you're under arrest.
>
> "And I tell him, for what.
>
> "And he tells me, *for murder*.
>
> "And I just couldn't believe it, [Humbert] was dead.
>
> "Q:    He told you that *in the hotel room*?
>
> "A:    Uh-huh.
>
> "Q:    And what did you think?
>
> "A:    I just — I was floored. Like I just couldn't believe it." (Italics added.)

25

The fact that defendant's emotions were recorded hours later on the DVD when she was *again* told of Humbert's death at best evidences that, at the time, defendant did not recall what she was told and understood hours earlier.

Defendant further suggests that she was entitled to show the jury her emotional reaction, because without it the circumstantial evidence supporting the defense theory (that the stabbing was unintentional and accidental) "was in equipoise" with the prosecution's theory (that the stabbing was intentional and deliberate). By focusing on the *circumstantial* evidence of what happened in the driveway at the time defendant stabbed Humbert, however, defendant fails to recognize and acknowledge the *direct* evidence of the intentional and deliberate nature of the attack: Earlier in the day of the incident, defendant texted her landlord that she felt like stabbing "the next dude who seems like he's fucking with me"; less than an hour before defendant stabbed Humbert, she told Ortiz-Tello that she (defendant) was coming to see Humbert and "if something happens to [Humbert], that's on him"; just prior to the stabbing, when she and Humbert were arguing in the driveway at Ortiz-Tello's house and he told her that he was not getting back together with her, defendant said she "just couldn't take it anymore"; and immediately before Humbert reentered the house with his hand pressed to his chest and blood spurting out, defendant said to Humbert, "I could kill you right now, you know." The fact that, at trial, defendant denied or may not have recalled making those statements is irrelevant to our determination whether the record contains substantial evidence in support of the judgment.

26

Finally, defendant contends that the DVD would have validated and corroborated her testimony that she was "heavily intoxicated and under the influence of controlled substances." First, the evidence of defendant's intoxication was overwhelming and undisputed: At the point in time when defendant arrived at Ortiz-Tello's house, defendant had been up for days, doing heroin every six hours and smoking methamphetamine at least every four hours, in addition to taking the prescribed methadone and Klonopin; and defendant had ingested even more drugs during the hours after the stabbing and before her arrest. Moreover, there was nothing on the DVD that would have told the jury that defendant's behavior was due to drug use; to the contrary, on the DVD there is the suggestion that defendant's behavior was due to having just been awakened in order to answer questions.

For the foregoing reasons, defendant did not meet her burden of establishing a reasonable probability that she would have received a more favorable result had the DVD been admitted into evidence. Accordingly, any error potentially associated with ruling that the DVD was hearsay is harmless.

C.    *Effectiveness of Counsel*

Defendant argues that her trial counsel rendered constitutionally ineffective assistance by failing to request CALCRIM No. 522 (or a comparable instruction) which would have told the jury of the potential effect of provocation in reducing first degree murder to second degree. CALCRIM No. 522 is entitled "Provocation: Effect on Degree of Murder" and provides in full:

27

"Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]

"[Provocation does not apply to a prosecution under a theory of felony murder.]"

During a conference on jury instructions, the court asked "What about [CALCRIM No.] 522" (without more), commented that it did not have a sua sponte obligation to give the instruction[12] and looked to defense counsel for her input. The *entirety* of counsel's response was: "I mean, it is interesting. It is a [*sic*] restating another theory of lack of deliberation. I would ask that 522 be given. I don't know. I don't think it applies. I don't think 522 applies." The court agreed, and the discussion turned to the next instruction.

1.      *Law*

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to competent representation by trial counsel. (*Strickland*, *supra*, 466 U.S. at pp. 689, 690; *People v. Holt* (1997) 15 Cal.4th 619, 703.)

In reviewing a claim of ineffective assistance of counsel, we must consider *both* "whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms *and* whether the defendant suffered prejudice to a

---

12      This is a pinpoint instruction, to be given on request; the court has no sua sponte duty to instruct the jury on this issue. (*Rogers*, *supra*, 39 Cal.4th at pp. 878-879 [CALJIC No. 8.73].)

reasonable probability, that is, a probability sufficient to undermine confidence in the outcome." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*); see *Strickland*, *supra*, 466 U.S. at p. 694.) The burden of proving both of these issues is on the appellant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.)

Finally, if the appellate record does not disclose *why* defense counsel acted as she did, "an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*Carter*, *supra*, 30 Cal.4th at p. 1211.) Under such circumstances, an aggrieved appellant may present her claim in a petition for writ of habeas corpus. (*Ibid.*)

2.      *Analysis*

Here, counsel was not asked why she was not requesting the provocation instruction. Her statement that she "d[oes]n't think it applies" is ambiguous at best, especially given her immediately preceding statements — first, that she wanted the instruction given and, second, that she did not know. Thus, we look to the record to determine whether there is any satisfactory explanation for the decision; if so, then we cannot conclude on direct appeal that counsel was ineffective. (*Carter*, *supra*, 30 Cal.4th at p. 1211.)

Defendant argues that because there was substantial evidence of provocation, there could be no explanation for failing to request an instruction that might result in a conviction for second degree, rather than first degree, murder. Defendant fairly summarizes the evidence supporting provocation, including defendant's request that the

court instruct the jury on provocation in the context of the voluntary manslaughter heat of passion instruction (see CALCRIM No. 570), but that is not the end of the inquiry. As the People persuasively counter, based on defense counsel's closing argument defendant's principal defense was that the stabbing was an accident — a reasonable conclusion if the jury believed defendant's testimony and found reasonable her explanation that she and Humbert were arguing, that Humbert was holding a knife and approaching her, that she was backing up with a knife in her hand and that she merely pushed him. Defendant's counsel emphasized defendant's version of the events in the context of the People's burden (for purposes of establishing first degree murder) of proving beyond a reasonable doubt that defendant went to Ortiz-Tello's house with the specific intent to kill Humbert.

Given this closing argument, we can see a possible tactic in counsel's decision not to request the pinpoint instruction. Had the jury agreed that defendant's explanation was reasonable and the stabbing was accidental, counsel could have argued for *a complete acquittal*. In contrast, had the jury been instructed and returned its verdict under CALCRIM No. 522 (or a comparable provocation instruction), the best counsel could have argued for was *second degree murder*. Here, the evidence of provocation — namely, that Humbert provoked the stabbing — was entirely inconsistent with the evidence supporting an accident, defendant's principal theory of her defense. As such, we are not persuaded that defendant's trial counsel had "no rational tactical purpose in not

30

requesting an instruction on [provocation]."[13] (*People v. Wader* (1993) 5 Cal.4th 610, 643.) An attorney does not provide ineffective assistance by failing to request a pinpoint instruction that is inconsistent with her theory of the defense. (*Ibid.*)

Accordingly, we reject defendant's claim of ineffective assistance of counsel.

D. *Cumulative Effect*

Defendant argues that the cumulative prejudicial effect of the errors associated with the issues discussed at parts II.A. through C., *ante*, deprived defendant of due process and a fair trial. Because we have found neither error nor prejudice, "there was no prejudicial error to accumulate." (*People v. Scott* (2011) 52 Cal.4th 452, 495.)

---

[13] The fact that defense counsel argued *for* an instruction on voluntary manslaughter based on the heat of passion (see CALCRIM No. 570) is irrelevant to our analysis. First, in the event the jury rejected the accident theory but believed there was evidence of provocation, counsel may have had a tactical reason in asking for manslaughter rather than second degree murder. In any event, given the evidence of provocation here, the court was required sua sponte to give the instruction on voluntary manslaughter based on the heat of passion, regardless what defense counsel requested. (*Breverman*, *supra*, 19 Cal.4th at pp. 158, 162.)

31

## DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

HALLER, Acting P. J.

McDONALD, J.