Filed 1/22/16  P. v. Hogue CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062369 |
| v. | (Super.Ct.No. FVI1200334) |
| CLARENCE EDWARD HOGUE III, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Eric M. Nakata, Judge.  Affirmed.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

For no known reason, defendant Clarence Edward Hogue III stabbed and killed a friend while they were alone in a room together.  Later, defendant resisted arrest.

Defendant testified that he did not remember the stabbing, but at the time, he was using methamphetamine regularly. A defense expert testified that methamphetamine can "disrupt[] . . . normal brain function so that you don't process things the way that you would normally do." In closing, defense counsel argued that defendant may have been unconscious when the stabbing occurred.

After a jury trial, defendant was found guilty on one count of second degree murder (Pen. Code, § 187, subd. (a)), with an enhancement for personal use of a deadly weapon (Pen. Code, § 12022, subd. (b)(1)), and two counts of resisting a peace officer (Pen. Code, § 148, subd. (a)(1)). In a bifurcated proceeding, after defendant waived a jury, the trial court found one "strike" prior (Pen. Code, §§ 667, subds. (b)-(i), 1170.12) and one 1-year prior prison term enhancement (Pen. Code, § 667.5, subd. (b)) to be true. Defendant was sentenced to a total of 32 years to life, along with the usual fees, fines, and restrictions.

Defendant appeals, contending:

1. There was insufficient evidence that defendant was conscious when he committed the stabbing.

2. The trial court erred by failing to instruct that voluntary intoxication causing unconsciousness can reduce murder to involuntary manslaughter.

We find insufficient evidence to raise a question as to whether defendant was unconscious, plus sufficient evidence that he was conscious. Hence, we find no error, and we will affirm.

# I

## FACTUAL BACKGROUND

Brandon Singleton shared an apartment in Apple Valley with three other people. Defendant was Singleton's cousin. Defendant was also homeless. He slept at Singleton's apartment a couple of nights a week and kept some of his things in a hall closet. Defendant's nickname was "Cali."

On the night of February 5-6, 2012, defendant was staying at the apartment. Earlier that day, one of the residents had seen him with a black folding knife.

One Dennis Moore was also staying overnight. Defendant and Moore were friends; they had known each other for a couple of months. Defendant was about 26 years old. Moore was 19 years old.

Around 8:30 p.m., the residents of the apartment retired to their respective bedrooms, leaving defendant and Moore in the living room. Suddenly, Moore said, "No, Cali." Then he screamed, "Cali stabbed me."

One resident (Kennith Morgan) saw defendant in the hallway, "[j]ust standing there," not saying anything. Another resident (Cherie Reyes) asked defendant, "What did you do?" He said, "Nothing," then left the apartment. Morgan looked out a window and saw defendant standing in the driveway.

Meanwhile, Moore knocked on Singleton's bedroom door. Singleton let him in. He tried to calm Moore down and to put pressure on his wound, but Moore

"overpowered" him, ran into the other bedroom, then collapsed. By this point, defendant was no longer outside.

Moore had one fatal stab wound, to his chest, which penetrated the heart. In addition, he had four superficial, apparently defensive wounds on his left hand and forearm. When the police arrived, he was still breathing but unresponsive. He would have died within minutes after being stabbed. Blood tests showed that he had both methamphetamine and alcohol in his system.

In the closet where defendant kept his things, the police found a methamphetamine pipe.

The next day, the police got a tip that defendant was on a certain public transit bus. They stopped the bus, and two officers boarded it. Defendant was sitting in the back. They asked him several times to turn around so they could handcuff him; he just sat there staring at them. They grabbed him; he pulled away. They pulled him to the ground and handcuffed him forcibly. He continued to resist by putting one of his hands under his body, stiffening up, and pulling away.

In defendant's pocket, the police found a black butterfly knife. The blade tested positive for blood.

The police did not test defendant for drugs because he did not appear to be under the influence.

Defendant took the stand and testified that he did not remember anything about the stabbing. When it occurred, he was using methamphetamine every two or three days. At

some points in his life, he drank heavily; he had had "numerous" blackouts. As of February 2012, he was not supposed to drink because he was on parole. However, he still drank sometimes. He had been prescribed psychiatric medications, but he had stopped taking them because he did not have a place to get them.

The defense called Dr. John Treuting, a toxicologist, as an expert on "the science behind . . . issues relating to drugs." He testified that methamphetamine can cause users not to eat or sleep, which in turn can "disrupt[] . . . normal brain function so that you don't process things the way that you would normally do." Methamphetamine use can lead to paranoia, delusions, hallucinations, irrational behavior, confusion, and violent behavior. Dr. Treuting admitted, however, that people who are agitated and paranoid and delusional are not unconscious.

Alcohol "can affect . . . your ability to remember things and [cause] blackouts . . . ." A blackout may be "fragmentary," meaning you remember some things but not others, or "a blank," meaning you have "no recollection of anything that occurred even though you weren't unconscious. You just have no remembrance of it."

In Dr. Treuting's view, defendant's "behavior was very unusual," because he did not "flee the scene and try to get away . . . ." This seemed to indicate "either an organic problem or [the] use of [a] drug." Dr. Treuting also noted that the victim had used alcohol and methamphetamine; alcohol users tend to congregate with alcohol users, and methamphetamine users tend to congregate with methamphetamine users. However, he

admitted that not everybody who interacts with an alcohol or methamphetamine user is necessarily using alcohol or methamphetamine.

## II

### THE SUFFICIENCY OF THE EVIDENCE OF CONSCIOUSNESS

Defendant contends that there was insufficient evidence that he was conscious.

"Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge. [Citations.] To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417.)

"On the other hand, voluntary intoxication, even if it induced unconsciousness, is not a defense to crime as such, though it may be relevant to whether the defendant formed a specific intent necessary for its commission. [Citations.] Voluntary intoxication can prevent formation of any specific intent requisite to the offense at issue, but it can never excuse homicide. Hence, at the time [a] defendant committed his crime[], where voluntary intoxication rendered the defendant unconscious, '"criminal negligence [was] deemed to exist irrespective of unconsciousness,"' and the offense was involuntary manslaughter. [Citation.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 469, fn. omitted.)

"The prosecution has the burden of proving beyond a reasonable doubt that [the] defendant was conscious during the commission of the crime." (*People v. Cruz* (1978)

83 Cal.App.3d 308, 330-331; accord, *People v. Babbitt* (1988) 45 Cal.3d 660, 693.)

However, there is a "judicially created presumption that a person who acts conscious is conscious. [Citation.]" (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1317.) "A defendant can overcome the presumption regarding consciousness by simply producing sufficient evidence to raise a reasonable doubt that he or she was conscious when he or she acted during the commission of the alleged crime. [Citation.]" (*Id*. at p. 1318.) Moreover, "the prosecution's proof [may] of itself raise such a doubt." (*People v. Babbitt*, *supra*, 45 Cal.3d at p. 694.)

Here, defendant did not introduce sufficient evidence to rebut the presumption of consciousness. He points to his own testimony that he did not remember the stabbing. However, a defendant's professed inability to recall an event, without more, is not sufficient evidence of unconsciousness. (*People v. Rogers* (2006) 39 Cal.4th 826, 888; *People v. Heffington* (1973) 32 Cal.App.3d 1, 10.) "[W]hile 'a reviewing court' must 'assume that [the defendant's] selective recollection was natural, not feigned' it is 'far short of a claim or description of . . . coexistent unconsciousness.'" (*People v. Carlson* (2011) 200 Cal.App.4th 695, 704.)

It could be argued that defendant's failure to get rid of the knife was some evidence of unconsciousness. As defense counsel put it, "[E]ven a moron would try to get rid of the knife. Throw it away, put it in somebody's house, throw it in somebody's back yard, anything. It's in his pocket, and it had blood on it. Again, even the stupidest murderer would wash that knife off if he knew what he had done . . . ." At bottom,

however, this is only additional evidence of lack of recollection, which, as already discussed, falls short of showing unconsciousness.

Defendant also points to his behavior immediately after the stabbing. Initially, he was seen "just standing there." When asked, "What did you do?," he replied, "Nothing." He then left the apartment, but he stood outside in the driveway. Dr. Treuting testified that this "unusual" behavior made him suspect "either an organic problem or [the] use of [a] drug." However, Dr. Treuting never testified that it was evidence of unconsciousness.

The very fact that defendant replied to the question shows that, at least by that point, he was aware and not stuporous. But even if offered to prove that he had only just come to and was unaware of what he had done immediately previously, it was still insufficient, for two reasons.

First, while defendant did not flee instantly, he did flee. Morgan saw him outside in the driveway, but Singleton, just minutes later, did not. The police arrived so quickly that the victim was still breathing, yet defendant was already gone.

Second, it must be remembered that defendant was at the apartment to spend the night there. He had no reason to leave — other than that he had just stabbed someone. Moreover, by saying "Nothing," yet showing no curiosity about why Reyes was asking, he indicated that he knew he had done something. No reasonable juror could have concluded that he was unaware of what he had just done.

Voluntary intoxication, standing alone, also is not sufficient evidence of unconsciousness. (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1084.)

Defendant's expert testified that methamphetamine can "disrupt[] . . . normal brain function so that you don't process things the way that you would normally do" and can cause a "confusional state."  He also testified that defendant's behavior was "very unusual"; it indicated that defendant either had "an organic problem" or was using "a drug like methamphetamine or alcohol."  However, he did not testify that methamphetamine can cause unconsciousness.  Indeed, in closing, defense counsel conceded, "[Y]es, we know that methamphetamine alone may not cause unconsciousness . . . ."

Defense counsel did argue that "methamphetamine . . . , when combined with alcohol, when combined with some psychotic disorders, when combined with days of lack of sleep, all of these things can cause unconsciousness."  However, there was no *evidence* of this.  Defendant's expert testified that alcohol can cause a person to have "no recollection of anything that occurred *even though you weren't unconscious*.  You just have no remembrance of it."  (Italics added.)

Finally, even assuming there was some evidence of unconsciousness, there was ample evidence of consciousness.  This includes, as just mentioned, the fact that defendant replied "Nothing," despite apparently knowing what Reyes was asking about, as well as the fact that he left the scene.  In addition, the victim's wounds indicated that defendant stabbed him more than once, while he was trying to defend himself.  The single thrust that the victim failed to deflect hit him in the heart, showing that defendant

was acting with the conscious intent to kill. Finally, when the police located defendant, he resisted arrest, thus displaying consciousness of guilt.

Defendant asserts that the prosecution could not carry its burden of proving consciousness unless it introduced at least some evidence that *could not possibly* be reconciled with unconsciousness.[1] This is not the standard. "[T]he reviewing court must accept logical inferences that the jury might have drawn from any circumstantial evidence. [Citation.] While it is the jury's duty to acquit where circumstantial evidence is subject to two reasonable interpretations, one which points to guilt and one which points to innocence, it is the jury, not the appellate court, that must be convinced beyond

---

[1] Defendant states: "If all of the evidence presented is consistent with either the existence or nonexistence of an ultimate inference, it establishes neither, and '"as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other."' (*People v. Allen* (1985) 165 Cal.App.3d 616, 626.)"

Defendant has truncated the quotation from *Allen*, making it misleading. In *Allen*, both the defendant and an accomplice were in a kitchen with the murder victim when the victim was shot. (*People v. Allen*, *supra*, 165 Cal.App.3d at pp. 621, 625.) The court held that this was insufficient evidence to sustain a personal firearm use enhancement. (*Id.* at p. 626.) It explained: "Since the evidence of what happened in the kitchen proved at most a 50 percent probability that [the defendant] was the user [of the firearm], the state's burden was not met: 'We . . . have a case belonging to that class of cases where proven facts give[] *equal support* to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other . . . .' [Citation.]" (*Ibid.*, italics added)

Thus, *Allen* was not a case in which the evidence was simply *consistent* with two opposite possibilities. Rather, in *Allen*, there was *no* evidence that either possibility was *more likely*.

a reasonable doubt.  [Citation.]  Where circumstances reasonably justify a jury's findings of fact, a reviewing court's conclusion that such circumstances might also reasonably be reconciled with contrary findings does not justify reversal.  [Citation.]" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 602.)  Thus, here, the jury could be convinced beyond a reasonable doubt by evidence that, in its view, made consciousness more likely, even if it could be reconciled with unconsciousness.

We therefore conclude that there was sufficient evidence that defendant was conscious when he stabbed the victim.

III

FAILURE TO INSTRUCT THAT

VOLUNTARY INTOXICATION THAT CAUSES UNCONSCIOUSNESS

CAN REDUCE MURDER TO INVOLUNTARY MANSLAUGHTER

Defendant contends that the trial court erred by failing to instruct that voluntary intoxication that causes unconsciousness can reduce murder to involuntary manslaughter.

A.    *Additional Factual and Procedural Background.*

1.    *The instructions conference.*

After both sides rested, the trial court asked defense counsel if she was going to request any instructions on lesser included offenses.  She replied that she was going to request "the unconsciousness involuntary instruction."  The trial court told her, "Go ahead and get that, bring it over, so I can take a look at it."  Thereafter, there was some discussion of jury instructions off the record.

At the next court session, the trial court held an instructions conference.  The prosecutor objected to "the voluntary intoxication instruction," but the trial court overruled the objection.  Otherwise, there was no discussion of voluntary intoxication, unconsciousness, or involuntary manslaughter.

2.  *The trial court gave only a general instruction on voluntary intoxication.*

The trial court gave CALCRIM No. 3426 ("Voluntary Intoxication"), as follows:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with malice aforethought.

"A person is voluntarily intoxicated if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"In connection with the charge of murder, the People have the burden of proving beyond a reasonable doubt that the defendant acted with malice aforethought.  If the People have not met this burden, you must find the defendant not guilty of murder.

"You may not consider evidence of voluntary intoxication for any other purpose."

3. *The trial court failed to give the instruction on voluntary intoxication for homicide cases*.

The trial court did not give CALCRIM No. 625 ("Voluntary Intoxication: Effects on Homicide Crimes"). This instruction would have been similar to CALCRIM No. 3426, which the trial court did give. However, it would have stated:

"You may consider evidence, if any, of the defendant's voluntary intoxication . . . in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] *the defendant was unconscious when (he/she) acted . . . .*]" (Italics added.)

4. *The trial court failed to instruct that voluntary intoxication causing unconsciousness can reduce murder to involuntary manslaughter*.

The trial court also did not give CALCRIM No. 626 ("Voluntary Intoxication Causing Unconsciousness: Effects on Homicide Crimes"). This instruction would have stated:

"Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions.

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

"Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:

"1. The defendant killed without legal justification or excuse;

"2. The defendant did not act with the intent to kill;

"3. The defendant did not act with a conscious disregard for human life;

"AND

"4. As a result of voluntary intoxication, the defendant was not conscious of (his/her) actions or the nature of those actions.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of (murder . . . )."

> 5. *The trial court gave standard involuntary manslaughter and unconsciousness instructions.*

The trial court did give the standard involuntary manslaughter instruction, CALCRIM No. 580. This informed the jury, among other things, that:

"The defendant committed involuntary manslaughter if:

"1.  The defendant committed a crime or a lawful act in an unlawful manner;

"2.  The defendant committed the crime or act with criminal negligence; and

"3.  The defendant's acts caused the death of another person."

The instruction did not refer to either unconsciousness or voluntary intoxication.

The trial court also gave the standard unconsciousness instruction, CALCRIM No. 3425.  This instruction informed the jury, among other things, that:  "The defendant is not guilty of any crime charged if he acted while legally unconscious."

B.    *Analysis*.

Defendant argues that, as a result of the instructions given and not given, as detailed above, and in particular as a result of the failure to give CALCRIM No. 625, the jury was not told that voluntary intoxication that causes unconsciousness can reduce murder to involuntary manslaughter.

Preliminarily, the People respond that defense counsel forfeited defendant's present contention by failing to request the omitted instructions.

Defense counsel did not request CALCRIM No. 626.  She indicated that she was going to request "the unconsciousness involuntary instruction."  The trial court told her, "Go ahead and get that, bring it over, so I can take a look at it."  However, there is no indication that she ever did.

Nevertheless, a trial court has a duty to instruct sua sponte on involuntary manslaughter based on unconsciousness due to voluntary intoxication whenever there is substantial evidence to support such an instruction.  (*People v. Halvorsen*, *supra*, 42

Cal.4th at p. 418.)  This is an aspect of its duty to instruct on lesser included offenses. (See generally *People v. Barton* (1995) 12 Cal.4th 186, 194-195.)  Accordingly, defense counsel's failure to request CALCRIM No. 626 was not a forfeiture.

For the reasons discussed in part II, *ante*, however, there was no substantial evidence that defendant was unconscious.  A fortiori, there was insufficient evidence that he was unconscious as a result of voluntary intoxication to call for an instruction on this theory of involuntary manslaughter.

Separately and alternatively, even assuming there was sufficient evidence to call for such an instruction, on this record, the failure to give it was harmless.  "The erroneous failure to instruct on a lesser included offense generally is subject to harmless error review under the standard of *People v. Watson* (1956) 46 Cal.2d 818, at pages 836-837 . . . .  Reversal is required only if it is reasonably probable the jury would have returned a different verdict absent the error or errors complained of.  [Citations.]"  (*People v. Rogers*, *supra*, 39 Cal.4th at pp. 867-868, fn. omitted.)  "[E]vidence sufficient to warrant an instruction on a lesser included offense does not necessarily amount to evidence sufficient to create a reasonable probability of a different outcome had the instruction been given.  [Citations.]"  (*People v. Banks* (2014) 59 Cal.4th 1113, 1161, disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)  Here, the evidence that defendant was unconscious as a result of voluntary intoxication, if there was any at all, was extremely weak.  Thus, we see no reasonable likelihood that, in the absence of

the asserted error, the jury would have found defendant guilty only of the lesser included offense.

Defendant argues that the jury gave his claim of unconsciousness "serious consideration," as shown by the fact that it deliberated for a day and a half and it asked for a readback of Reyes's testimony as well as for a definition of second degree murder. However, the jury's total time spent deliberating, not counting readbacks, was only about six hours. This was not particularly lengthy for a trial with 13 witnesses and three counts, including murder. (See *People v. Taylor* (1990) 52 Cal.3d 719, 732 ["[t]he length of the jury's deliberations cannot be said to be unduly significant in light of the gravity of its task"].) It had been instructed on unconsciousness, albeit as a compete defense; thus, it was simple diligence on its part to comb the record for evidence of unconsciousness. Nothing about the length or the nature of the jury's deliberations suggests that it was reasonably likely to have had a reasonable doubt that defendant was conscious.

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
P. J.

We concur:

McKINSTER_____
J.

CODRINGTON_____
J.